HENDERSON BRIDGE COMPANY *v.* McGRATH.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF INDIANA.

No. 63. Argued November 4, 1889. — Decided March 17, 1890.

M. contracted with a bridge company to construct the road for a railway, according to specifications and profile, from the end of its bridge to Evansville, about six miles. The road was to run on bottom lands, with an uneven natural surface, and the profile showed part trestle and part embankment. It was contemplated that the material for the embankments was to be taken from borrowing-pits along the line. The specifications fixed prices for excavation, for filling and for trestling, and provided that the relative amounts of trestle and earthwork might be changed at the option of the engineer without prejudice. During the progress of the work the company decided to modify the plan by abandoning the trestling in the line of the road, substituting for it a continuous embankment, and by making a draining ditch along the whole line, running through the borrow-pits. In order to serve its intended purpose this ditch was required to be of a regular downward grade, with properly sloping sides. Some of the borrow-pits were found to be

too deep, and others too shallow, and it was found that they had been excavated without reference to the slope at the sides. There were highways and private roads crossing the line at grade. The contract did not indicate how the approaches of these roads were to be constructed; but when the change was determined on, it was decided to make them of trestle. This work was more expensive than the trestle provided for in the contract. The company directed its engineer to have these modifications carried out, and the contractor was notified of this. He made no objection to the substitution of embankment for trestling; but as to the ditch, he objected that it was not in the contract. A conversation followed, in which the contractor understood the engineer to say that it would be paid for at excavation prices from the surface down, but the company claimed that it was only intended as an expression of the opinion of the engineer, which, it said, was made without authority. As to the trestle approaches the contractor was informed that he would be paid what was right. The work was constructed in all respects according to the modified plans. In settling, the contractor claimed to be paid for the ditch as excavation from the surface down. The company claimed that the material taken from the borrow-pits should be deducted from the total. There were about 2800 feet in all of the trestle approaches. The contractor accepted payment for 2100 feet at the contract price, and as to the remaining 700 feet claimed to be paid according to what the trestles were reasonably worth. The company claimed that they should be paid for at the contract price; *Held,*

(1) That the construction of the ditch was outside of the original contract;

(2) That the fact that it passed through the borrowing-pits did not modify that fact;

(3) That the engineer had authority to agree with the contractors that they should be paid for it as excavation from the surface down;

(4) That it was right to leave it to the jury to determine whether such an agreement was made between the contractors and the local engineer, acting for the company;

(5) That it was properly left to the jury to decide whether the company agreed to pay for the trestle approaches what they were reasonably worth;

(6) That as the agreement was to pay, not a fixed price, but what the trestling was reasonably worth, which the law would have implied, it was immaterial whether the agent of the company had or had not authority to make it.

THIS was an action at law brought by the defendants in error against the plaintiff in error in the Circuit Court of Vanderburgh County, Indiana, and removed into the Circuit Court of the United States for the District of Indiana.

The Henderson Bridge Company was a corporation of the

State of Kentucky, organized for the purpose of building a bridge over the Ohio River from the city of Henderson, Kentucky, to the Indiana bank of the river, and a railroad thence to the city of Evansville, Indiana, a distance of about nine miles.

On the 8th of July, 1884, a contract was made between the company and the defendants in error for the grading, masonry and trestling of the railroad for a distance of something over six miles, measuring from Evansville to the bridge, designated as sections 1 to 6 inclusive, and a part of section 7, each section being one mile long. No formal written contract was executed between the parties; but the agreement arrived at consisted of, (1) specifications and profile of the work to be done, on the part of the company; (2) proposals on the part of the contractor; and (3) acceptance of the proposals by the company.

The specifications prepared by the chief engineer of the defendant classified the work as "Clearing and grubbing," "Excavations," "Embankments," "Masonry," and "Pile Trestle."

· Defendants in error completed the work about the 1st of March, 1885, and the company accepted it. On the final settlement a controversy arose as to the amount of the balance due the defendants in error, after crediting the partial payments made as the work progressed; and this suit was brought to recover the amount of $23,667, claimed by them to be due, which the company had refused to pay.

The bills of exception taken below, however, and the errors assigned, narrow the controversy in this court to two items — one being in respect to a drainage ditch, which was ordered to be made; the other in regard to the value of certain extra pile-work. Our statement of the case will be confined to an examination of those points.

(1) The work contracted for lay, all except the two sections nearest to Evansville, through the bottoms of the Ohio River, which were subject to overflow. On that portion in the bottoms the profiles showed several stretches of trestling which aggregated 1486 feet. The specifications, however, provided

that " the quantities marked on profile are approximate, and not binding. The relative amounts of trestle and earthwork may be changed at option of the engineer without prejudice."

While the work was in progress the company determined to modify the plan so as to omit the trestle and make a continuous embankment with underlying drain-pipes. This modification necessitated a different system of surface drainage ; and it was determined that the borrow-pits (that is to say, the excavations along the line of the railroad from which the earth was taken to form the embankment) should form a drainage ditch on the eastern side for about two-thirds of the way. Mr. Hurlburt, who was the company's third engineer in rank, and had immediate supervision of the work in the field, was directed to have these modifications carried out.

In consequence of this change of the plan, Mr. Vaughan, the company's chief engineer, on the 16th of August, 1884, telegraphed O. F. Nichols, the resident engineer at Henderson, directing him to notify the defendants in error that " all trestle on portion of line embraced in their contract will be dispensed with." And on the 26th of August following Nichols wrote them as follows: " As directed by the chief engineer, Mr. F. W. Vaughan, I hereby notify you that the trestle shown north of station three hundred and thirty-three (333) on profile of the Henderson Bridge Railroad will be omitted. The corresponding space will be filled by solid embankment. Arrangements have been completed for additional borrow-pits necessary to complete these embankments." No objection was made to that change by the defendants in error.

In regard to the ditch, however, it was different. Defendants in error maintained that no such ditch was called for either by the specifications or by the profile, and that, therefore, they were under no contract to make it. They claimed further, and there was testimony in the record to the point, that on the day after the receipt of Mr. Nichols' letter, Hurlburt, the local engineer in charge, came to see them, and notified them that they would be required to make said ditch on the eastern side of the embankment from section three to section seven, inclusive, for the purposes of draining the borrow-

pits, such ditch to be two feet wide on bottom in section three. three feet at bottom in section four, four feet wide on bottom in section seven, and to run through the borrow-pits, and have a slope of one and a half feet, horizontal measurement, to one foot perpendicular. Defendants claimed further that they objected, on the ground that they could not make the ditch without compensation, and that thereupon Hurlburt replied that they would be paid for it at the same price they had bid for excavation, and that it would be estimated *from the top of the ground* down.

The company, on the other hand, denied both the fact of the making of such alleged supplementary contract, and the authority of the engineer, Hurlburt, to make it. It maintained that the evidence showed only an expression of opinion made by Hurlburt.

The annexed rude diagram of a cross-section of the work will illustrate the situation.

Defendants in error did not deny the fact of the coincidence, as stated, between the ditch and the borrow-pits, but they justified by saying that the basis of measurement adopted in their contract, while it was to a certain extent arbitrary, yet was not a cheating or improper basis, for the reason that it was a commutation, and was necessitated by the introduction of the continuous parallel ditch. The digging of such a ditch introduced, they claimed, an entirely new element into the work; it peremptorily demanded the careful maintenance of the ditch level throughout its whole extent, and required long hauls of dirt; and whereas, before the ditch was ordered, the excavation was made entirely with reference to the con-

venience of depositing the dirt in the embankment, afterwards it had to be made with reference to the ditch.

(2) The defendants in error were required to make certain trestle approaches on one side of the road for some of the road crossings, and farm crossings, into which were put 2800 lineal feet of piling. The profile did not indicate that these approaches were to be made of piling; and defendants in error claim that they were not, therefore, included in the bid, but were made under a new agreement that they should be paid for "as was right." The contract price for trestles was 30 cents per lineal foot, but the evidence of defendants in error tended to show that the construction of these trestles was worth from 60 cents to $1.50 per lineal foot.

The engineer's estimate for February, 1885, contained this item: "Secs. 3, 4, 5, 6, 7. Piles driven, 2108 lineal feet, 30 cents per lineal foot, $630.90." This was part of the piling in controversy; and on this estimate the defendants in error settled with the company for February and receipted it. The company then claimed that said settlement and receipt, and the original agreement as to value in the bid accepted, conclusively fixes the price at 30 cents per lineal foot for the whole 2800 feet; while the defendants in error, on the other hand, claimed that the receipt in February was merely for a payment for 2108 lineal feet, and that they could, as to the other 700 feet, still prove value on a *quantum meruit.*

Under these forms of the controversy, not necessary to be further adverted to here, the case was tried below. On the trial the court instructed the jury as follows: " The taking out of the trestles and the requirement of earthwork in their place created no basis for a claim for extra compensation; so that, for the purpose of the question we are now coming to, the case is the same as though the specifications and profile in the first instance had shown continuous embankment. The bridge company, having come to the conclusion to make this embankment, deemed it proper to make a change in the requirements in respect to ditches, but there is no reservation in the contract in regard to that. Of course, the general terms of the contract in respect to the right of the engineer to oversee

the work may embrace the power to direct reasonable changes in regard to ditches, but there is nothing authorizing the bridge company to substitute a continuous ditch for the ditches defined upon the original profile; so when they determined to require this continuous ditch to be made, it necessarily put the parties into a position for negotiation on the subject, and Mr. Hurlburt, the engineer in charge, being authorized to have this ditch constructed, had incidental authority to agree upon the price or mode of measurement."

The defendant at the time excepted to so much of that instruction as is contained in the following words, viz. : "But there is nothing authorizing the bridge company to substitute a continuous ditch for the ditches defined upon the original profile, so when they determined to require this continuous ditch to be made, it necessarily put the parties into a position for negotiation on the subject, and Mr. Hurlburt, the engineer in charge, being authorized to have this ditch constructed, had incidental authority to agree upon the price or mode of measurement."

The court also gave the jury the following instructions, viz. : "But when it was proposed to make a continuous ditch on the east side of the track at the same time the embankment was being made, that introduced a new element into the problem. If the parties were to make an embankment and ditch also, it became desirable to take the dirt for the embankment from such localities as would be most effective in producing the ditch, and it necessarily resulted from this state of things that a party making embankment would, or might at least, make embankment and ditch at the same time. He might be taking earth out for the purpose of making embankment which he could have taken from another place more economically if he was not intending to make this ditch. It follows that earth taken from the same place may represent embankment, and also ditch. The excavation made might be borrow-pit, and it might be ditch, and consequently it became proper for the parties concerned to adopt some system by which they would compute the respective amounts to be credited to each phase of the work.

The same work being effective, both towards making the embankment and making the ditch, to treat it as all embankment or as all ditch, would be unjust. So it was for the parties, the bridge company and plaintiffs, to agree upon some plan upon which they could make a computation; and so I instruct you upon the facts as they appear without dispute that it was within the power of Mr. Hurlburt, the resident engineer, who was superintending the construction of the work, to make a contract with the plaintiffs, who were under contract to make the embankment for the making of this ditch, to agree that they should do this work, and how much of the excavation should be deemed to be for the purpose of embankment and how much for the ditch."

The defendant also excepted at the time to so much of that instruction as is in the words following, viz. : "And so I instruct you upon the facts as they appear without dispute that it was within the power of Mr. Hurlburt, the resident engineer, who was superintending the construction of the work, to make a contract with the plaintiffs, who were under contract to make the embankment for the making of this ditch, to agree that they should do this work, and how much of the excavation should be deemed to be for the purpose of embankment and how much for the ditch."

The court also gave to the jury the following instructions, viz. : "From the duty imposed upon him as resident engineer of the defendant arose Mr. Hurlburt's power to make an adjustment of the question. Plaintiffs claim he did make arrangements with them, by which it was agreed that the portion of excavation to be regarded as such should be considered as starting from the lower level of the ditch along its whole length and be measured at a certain slope to the surface of the earth as it was before work was commenced, and upon that they claim 37,256 cubic yards of excavation as ditch. Defendant claims that Hurlburt did not make any such agreement, and this is an issue of fact which the jury must determine upon the evidence. I will say, however, that under the circumstances, Mr. Hurlburt did have power to make the agreement if he saw fit so to do. If you find that

he did so, and that the measurements he returned are correct, then the plaintiffs are entitled to compensation accordingly for 37,256 cubic yards at 18 cents per cubic yard." And to the giving of that instruction the defendant at the time excepted.

The court also gave to the jury the following instruction: " If Mr. Hurlburt did not make such agreement with these parties, but simply told them what mode of measurement he thought would be adopted, but that it would have to be left to the chief engineer in the end, it would follow that the work was done without any special agreement, and you will be compelled to estimate it upon its fair and reasonable worth. You will, then, consider from the proof how much excavation was made for the ditch, and how much more to make the embankment than if the continuous ditch had not been required, and for the number of yards of earth excavated in consequence, allow 18 cents per cubic yard. In this view the figures of Mr. Hurlburt, though relevant, would not be conclusive as evidence. If he made the agreement, as the plaintiffs claim he did, and his estimates were correct, that is an end of the question. If he did not make the agreement and the question was left open, then you must determine the number of yards excavated for the ditch upon the proof and allow accordingly the contract price of 18 cents a yard."

The defendant at the time excepted to so much of that instruction as is in the following words, viz.: " If he made the agreement, as the plaintiffs claim he did, then that is an end of the question."

The defendant requested the court, in writing, to give to the jury the following instruction, viz.: " As to the ditch claimed by plaintiffs to have been made by them on the easterly side of the railroad of defendant, the plaintiffs are entitled to recover only for so much excavation as was actually done for the purpose of making such ditch, excluding any portion of the borrow-pits dug exclusively for the purpose of making the embankments, and that the jury can find for plaintiffs only the contract price of 18 cents per cubic yard for the excavation, which they may find from the evidence was so made for

the purpose of making such ditch." But the court refused to give that instruction; whereupon the defendant at the time excepted.

As to the claim of the defendants in error for a price extra to the original contract for the trestles built by them the court gave to the jury the following instructions: " The next item is the piles in the bridges. The contract price for piles is 30 cents per lineal foot. The profile and specifications, as originally drawn, or as they now stand, show considerable trestle work, and show generally highway crossings across the track at different places, but there is no statement in the specifications or in the profile with respect to what kind of crossing it shall be, whether of earth or of timber. There is a dispute between the parties arising out of this fact upon the question whether these bridges, made for the purpose of carrying highways over the embankment, are within the contract. The contract in that respect is ambiguous. The court, looking at the contract, cannot say what kind of crossing was intended. There is no proof of custom in this case sufficient to settle this point. We are therefore left to the construction which the contractors themselves have adopted, as shown by their conduct under the contract. When parties have made an ambiguous contract and have acted under it, and their joint actions show their understanding of it, courts and juries will follow the construction thus indicated. In this case the evidence shows that in respect to 2100 feet, in round numbers, the plaintiffs themselves treated the piles as coming within the terms of the contract in respect to price by receipting for that price upon the estimates. There has been evidence before the jury — I cannot rehearse it — as to what was said between the engineer of defendant and plaintiffs at the time this work was done. Perhaps the plaintiffs made some protest against doing this work at the price stated, but, nevertheless, they went on and did the work under that price and receipted for it, and I think the jury should accept that as conclusive upon that point. A subordinate engineer, working in behalf of a corporation, as Mr. Hurlburt was, has no right to waive the effect of receiving pay upon monthly estimates under a con-

tract like this. Such a contract would have but little force or value if a subordinate agent has the power to waive the terms, and this contract declares the estimates made by the engineer and furnished to the parties to be final, except for fraud or mistake. If the defendant had been an individual instead of a corporation he could have been there in person and waived the contract by saying we will leave that open; we will not make that conclusive; but I instruct you that this subordinate agent, Mr. Hurlburt, working for the bridge company, a corporation whose affairs must have been conducted by agents appointed to act for it — Mr. Hurlburt acting in this capacity — could not waive this stipulation in the contract, that the monthly and final estimates should be conclusive. Therefore, in respect to the piling included in the estimate, about 2100 lineal feet, plaintiffs have precluded themselves from claiming extra pay. In respect to the work on the embankment, the act of accepting pay at the contract price raises a presumption that that was the proper price for the whole amount, and, in the absence of proof to the contrary, the contract price should govern; but the presumption is not conclusive as to the 700 feet of piling not in the estimates, and if you find upon the proof that there was an agreement between plaintiffs and Mr. Hurlburt that these piles should be paid for at what they were reasonably worth, and not by the contract price, you may allow the reasonable value as shown by the proof on the subject."

The defendant at the time excepted to so much of that instruction as is contained in the following words, viz.: "But the presumption is not conclusive as to the 700 feet of piling not in the estimates, and if you find upon the proof that there was an agreement between plaintiffs and Mr. Hurlburt that these piles should be paid-for at what they were reasonably worth, and not by the contract price, you may allow the reasonable value as shown by the proof on the subject."

The defendant in writing requested the court to give the jury the following instruction, viz.: "Where any of the work done by plaintiffs and sued for in their complaint has been included in any of the monthly estimates of such work read to

them, and such work is therein valued at the contract price, such fact is conclusive evidence that such work was done under the contract and the prices fixed there final and conclusive."

But the court refused to give that instruction; to which ruling of the court the defendant at the time excepted.

It was claimed that, by reason of those instructions, the jury were authorized to find, and did find, for the defendants in error, for the alleged ditch, five thousand six hundred and thirty-six dollars and fifty-five cents, and for the piling eight hundred and fifty dollars, in excess of any rightful claim they had; and to that extent the plaintiff in error, which was the defendant below, averred the verdict to be erroneous.

The verdict of the jury upon which the judgment was rendered was for $13,470 in favor of the defendants in error.

The assignments of error were: (1) That the court erred in refusing to charge the jury in behalf of the defendant below as stated; and (2) that the court erred in those parts of the charge given, which were objected to by the defendant below, as stated.

*Mr. S. B. Vance* (with whom was *Mr. James M. Shackelford* on the brief) for plaintiff in error.

*Mr. Curran A. DeBruler* (with whom was *Mr. Alexander Gilchrist* and *Mr. Daniel B. Kumler,* on the brief) for defendants in error.

Mr. JUSTICE LAMAR, after stating the case as above, delivered the opinion of the court.

The main questions to be determined in the first branch of this case are these:

(1) Did the modification of the original specifications and profile, made in August, 1884, fall within the original contract, or did it create a feature in the work to be done, so different from that originally contracted for as to put the defendants in error in a position to make as to that feature a new contract?

(2) Did the engineer, Hurlburt, have authority to make such new contract?

(3) Did the court err in refusing to charge, as prayed, "that the plaintiffs [below] are entitled to recover only for so much excavation as was actually done for the purpose of making such ditch, excluding any portion of the borrow-pits dug exclusively for the purpose of making the embankments"?

We shall briefly consider those questions *seriatim*.

First. A careful examination of the specifications and profile, and of the testimony in the case, all set forth in the bills of exceptions, satisfies us that the requirement to construct a continuous drainage ditch parallel to the embankment, four and one-third miles long, and of the dimensions ordered, did create a new problem in the work not covered by the original contract. The ditch was required to have a fall of nearly two feet to the mile; to be two feet wide at the bottom at one end, and to increase in size to six-feet bottom width at the other end; and throughout, the sides were required to be scaled one and one-half foot horizontal measure to one foot perpendicular. The testimony shows that in one portion, at least, it was nine feet deep. It was made to drain off the water from the prescribed area, and to take the place of the county ditches. On this point McGrath, one of the defendants in error, testified that "to make the borrow-pits serve for a ditch it was necessary to haul the earth from the high ground, where the embankment was low, to the low grounds, where the embankment was high, whereas but for the ditch, the earth from the embankment would have been taken directly from the sides; that this in many places necessitated a longer haul of earth, and increased the cost of the embankment."

Wasson, who was a sub-contractor, testified that before the change was made he "had taken earth from borrow-pits about twenty inches deep, and afterwards had to dig to the depth of nine feet to make the ditch, and was required to haul this extra excavation, some of it six hundred feet."

Robinson testified that "if the work was changed so as to require a continuous ditch, it could not be done as cheaply as

it could if done as provided for in the specifications, because where the embankment would be low you would have to make a shallow borrow-pit, and in making a continuous ditch you would have to deepen that borrow-pit, to bring it to the ditch level and would have to carry the dirt forward, necessitating a haul. There was no continuous ditch contemplated in the profile of the work."

Fisher, a witness for defendants in error, testified that "he was a civil engineer of thirty-five years' experience, and largely as railroad engineer. If the specifications provided that the earth for embankment should be borrowed equally from both sides, and then a continuous ditch should be required to be made on one side of the embankment, it would necessitate a greater haul and would be more expensive. In consequence of the ditch a greater amount of earth would have to be taken from the side on which the ditch is made. One cannot work to such an advantage in a narrow ditch as in a broad borrow-pit. The deeper you go, the harder the earth is to work."

Outside of the testimony of the witnesses, it is manifest that to dig earth on a surface rolling and broken, as the profile shows the surface to have been in this instance, for the sole purpose of constructing a level embankment, and without regard to the depth or extent or level of the pits thereby made, is a very different problem from the digging with the double view of the construction of such an embankment, and the making of a continuous ditch with prescribed directions and uniform bottom level for a length of more than four miles.

It is true that, as the plaintiff in error says, the profile shows ditching in these same sections, covered by the original contract, to the amount of 4660 cubic yards; but it also is true that those ditches were of a very different character, and imposed no such burden on the contractor as did the one in question. Indeed, the plaintiff in error itself treated the modification as a serious change, and especially so considered the ditch, before the controversy arose. In the correspondence between the two engineers of the company, which determined on it, it is spoken of as a new system.

Second. We also think the engineer, Hurlburt, had authority to make a new contract for the ditching. The plaintiff in error insists that a subordinate engineer has no such authority by virtue of his employment. That may be conceded; but it is not the ground assumed by the defendants in error. They contend that Hurlburt was specially authorized to make the contract; and support that position by quoting the second engineer Nichols, who says, " that the plan of drainage suggested in my letter to Mr. Vaughan was accepted by him, *and Mr. Hurlburt was directed to have it carried out.*" This view is fortified by the fact that in Vaughan's letter to Nichols whereby the proposed changes were sanctioned 16th of August, 1884, and numerous items of adjustment and arrangement made necessary by such changes suggested, Vaughan, himself, clearly recognized the situation as one admitting of new terms with the contractors. He wrote, *inter alia*, of the change, "this solid bank business" he called it, "we might get a low rate for extra earth in consideration of the same."

In *Damon* v. *Granby*, 2 Pick. 345, the inhabitants of the town of Granby had voted that certain persons thirteen in number should be a committee to procure a master builder, and superintend the building of a meeting-house for the town. On the trial of the case, which was an action of debt by the builder of the meeting-house on the contract made with the committee, the defendants objected that the superintending committee had no authority to contract for the building of the house. The court held that the vote of the inhabitants gave to this committee the authority to enter into the contract. " To superintend the building of the house," says the court, " includes the power to make the necessary contracts," etc. See also Story on Agency, § 79.

Third. Nor do we think the court below erred in refusing to charge the jury that the defendants in error were only entitled to recover for such excavation as was actually done for the purpose of making such ditch, as distinguished from such portion of the ideal ditch as coincided in space with the borrow-pits, as portions thereof. In some cases, nay, in most cases, that would be a proper charge, perhaps, but not in this

case. Here the plaintiffs below claimed before the jury, as a matter of fact, that they held a valid contract with the defendant below, by the terms of which they were entitled to pay for the whole volume of the ditch (calling it "imaginary" in part makes no difference), from the bottom up to the original ground surface through its whole length; and that, whether said volume coincided with the spaces of borrow-pits or not. It was for the jury to say whether such contract did in fact exist. It was not for the court to assume and instruct the jury as a matter of law that it did not exist. Such a contract was not legally impossible. It was not claimed that the contractors defrauded the company, or in any way took advantage of it; and the basis of measurement, even if artificial and to an extent "imaginary," is not legally unreasonable, in view of the testimony of the witnesses as to the onerous and complicated labors of such a ditch. As a substitute and equivalent for all the items of demand — in increased volume of excavation, increased hauls, increased hardness of earth to be worked, etc., it may have been a very proper system. We cannot say that it was not.

As to the second branch of the case, viz., that in respect to the piling, it is objected by the plaintiff in error that the instruction of the court was erroneous for the following reasons: First. Because in speaking of the 700 feet still not paid for, the court said: "If you find upon the proof that there was an agreement between plaintiffs and Mr. Hurlburt that these piles should be paid for at what they were reasonably worth," etc.; while there was no evidence tending to show that Hurlburt made the agreement therein supposed. But there was such evidence. Ryan, one of the plaintiffs below, had testified that "we had no contract for this work, and before we began it I had a conversation with Mr. Hurlburt about it. I wanted to know what we would be paid for it, and he said that Mr. Vaughan would do what was right." This was claimed to be a contract for reasonable compensation. It was for the jury to say whether the conversation was with a contractual intent or not. The court had no right to assume as a matter of law that it was not, and refuse a

charge on that aspect of the case. Second. Because Hurlburt had no authority to make a contract in reference to this matter. But the contract spoken of, being for a compensation on a *quantum meruit*, and not for a specified price, it is immaterial whether Hurlburt had such an authority or not. If, as the representative of the company, he had made no express promise to pay, the law would imply one. There is no question as to his power to direct the work, and no claim that he exceeded his authority in directing the crossings to be made of trestle and pile work. Such being the case, we do not consider it necessary to discuss the abstract question of whether the language used by the court was technically accurate as applied to the case; if it was not, there was yet no material error — none that could have injured the defence.

We do not think that the acceptance of thirty cents for some of the trestles precluded the plaintiffs as to the value of others.

The judgment of the court below is

*Affirmed.*