## BLUE DIAMOND CO., Inc., v. CHARLES M. ALLEN & SON, Inc.

### No. 6352.

Circuit Court of Appeals, Fifth Circuit.
Feb. 26, 1932.

Rehearing Denied March 26, 1932.

HUTCHESON, Circuit Judge, dissenting.

John S. Stone, of Birmingham, Ala., for appellant.

R. H. Scrivner and White E. Gibson, both of Birmingham, Ala., for appellee.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

BRYAN, Circuit Judge.

Appellee recovered judgment against appellant in an action which alleges the breach of a contract to furnish the kind of mortar that had been specified by an architect for use in the construction of a building which appellee built under an agreement with Thomas Watts, the owner. The architect's specifications called for mortar containing one part of cement to two and a half parts of clean sharp sand, and gave permission that "the mortar, as above specified, may be made by the Blue Diamond process." It is undisputed that the mortar originally used contained one part of cement to six parts of sand, and therefore did not comply with the specifications but was of an inferior quality. Upon completion of the building, there developed through the mortar joints of the outside walls leaks which appellee repaired and stopped up, in compliance with the architect's requirements and its agreement with the owner. The judgment was for the amount expended in pointing up the mortar and making the necessary repairs, together with interest.

The architect testified that appellant's method of mixing mortar was merely a mechanical one, that it regularly made its mixture according to his specifications, but whether they had been complied with could

not be ascertained upon a casual inspection. This testimony was not contradicted, although there was evidence for appellant to the effect that the mortar originally used in the Watts Building was the only kind that it was then manufacturing.

The real question in the case is whether the parties entered into the contract alleged in appellee's petition; and its solution depends upon the legal effect of what was said in a conversation that was held between Charles T. Allen and W. H. Brooks. The former was appellee's secretary and general manager, and the latter was appellant's president; and there was no question as to the authority of either to act for the corporation he represented. Allen's testimony may be stated in condensed form as follows: It was appellee's duty to buy material for the Watts Building. Brooks came to see me and solicited an order for the mortar. I explained that we were doing this work under the supervision of an architect, and would be governed by his decision; and that he would have to comply with the architect's specifications. He then told me "that he had already done that," and that the architect "had incorporated" appellant's mortar "in the specifications." "On that assurance, I told him that we would use the mortar." We agreed on the price, which was either $6.75 or $7.25 per yard. "At the time I made the contract with Mr. Brooks to use Blue Diamond mortar, we had intended to do the masonry work ourselves, and, with that in view, I had bought the brick, terra cotta and the mortar. The Lewis Building Company * * * made us a proposition that was so advantageous that we decided to let them do it under a sub-contract. So I entered into a contract with them, explaining to them that we had obligated ourselves to use Blue Diamond mortar, and that we would expect them to use the stuff that we had bought. * * * The mortar was furnished to the sub-contractor, Lewis Building Company, and it paid for the mortar. The price that the sub-contractor bid for the work was based on the price that we had received for the mortar. My understanding was that the mortar was furnished to the Lewis Building Company under the contract that we made with Mr. Brooks." In giving his version of the conversation, Brooks testified that, after learning that Allen had secured the contract for the construction of the Watts Building, he went to him and asked him if he was going to do the brick work himself or sublet it. "Mr. Allen told me he did not know, but he might sub-let the brick work on that building. I do not remember having any other talk with

Mr. Allen in regard to furnishing mortar for the Watts Building. I was waiting to see whether he would do the brick work or sub-let it. When I discovered that Mr. Allen was not going to do the brick work on the building himself, I solicited the brick work from the Lewis Building Company, the sub-contractor." He further testified that before he went to see Allen he had already interviewed the architect, but was not familiar with the building specifications, although he knew that Blue Diamond mortar could be used; and admitted that he told Allen it had been approved for the Watts Building. It was appellant's practice to sell its material through dealers; and in this instance the order was handled through the Standard Building Material Company, but appellant itself delivered the mortar to the Watts Building in its own trucks. At the close of the evidence appellant moved for a directed verdict in its favor on the ground that the contract alleged had not been proven. The trial court denied this motion, and instead charged the jury that the contract sued on had been established, if they believed Allen's testimony to be true, but if they did not so believe, in view of Brooks' testimony, that they must find that there was no contract between the parties and return a verdict for appellant. A motion for a new trial was made on the ground, among others, of newly discovered evidence based upon the affidavit of J. D. McEaddy, member of the firm of the Lewis Building Company, subcontractor, to the effect that he represented this firm in the negotiations with Allen which resulted in the subcontract; that Allen did not represent to the subcontractor that he had the contract with appellant, but merely requested, "everything being equal," that its mortar be used. In a supporting affidavit Brooks stated he was unaware that appellee would present evidence on the trial to prove a contract between the parties to the suit whereby appellant agreed to furnish mortar, and that his first knowledge of the claim of the existence of such a contract was when Allen gave his testimony; and that after Allen testified McEaddy could not be located and produced as a witness at the trial.

There are a number of assignments of error based upon rulings during the course of the trial, but they all relate to the single point whether Allen's testimony was sufficient to prove the contract sued on. Of course, according to Brooks his conversation with Allen did not reach beyond the stage of negotiations, and the only contract made was with the subcontractor. But this theory disappears along with the rejection by the jury of

Brooks' testimony, as does also the contention that Allen was undecided whether he would do the masonry work himself or have it done by a subcontractor. In accordance with the verdict of the jury, we accept as true Allen's version of the conversation. Under the evidence so considered, in our opinion all the elements of a valid contract are present. There was a promise for a promise, a consideration was agreed upon, and there was nothing left for future decision. Brooks promised to furnish mortar which would comply with the architect's specifications. It is no defense that he did not know what those specifications were. They were available to him, and he admitted that he told Allen the mortar which he proposed to furnish had been approved by the architect. Allen promised to accept the mortar, and to pay a stipulated price for it. It was no concern of his if Brooks afterwards sold the same or a different kind of mortar to the subcontractor, although even then there would be an element of unfairness in his delivering mortar which he knew was of an inferior grade and did not come up to specification. Nor is Allen's promise affected by the circumstances that after he made it he accepted the offer of a subcontractor to do the masonry work, and a subcontractor received the mortar and paid for it. The mortar was delivered to the building and appellee was obligated to pay for it. There was nothing in the contract which would relieve Allen of his promise if the masonry work was done under a subcontract. Appellant delivered the mortar to the Watts Building by its own trucks, and it is of no importance that, under its trade practice and for its own purposes, a material dealer or jobber was credited with the sale. As appellee had no connection with the transaction, he could not be made to accept the dealer in the place of appellant as a party to the contract. The mortar, it is conceded, was not up to specification, and was unfit for the use to which it was put. There was thus shown a plain breach of contract, and appellee was damaged in the amount of the verdict which represented the cost of necessary repairs. The conclusion is that there was no error in refusing the request for a directed verdict, or in giving the charge complained of.

Denial of the motion for a new trial is also assigned as error, but clearly no abuse of the trial court's discretion is shown. Appellant must have known that appellee would undertake to prove the existence of the contract alleged, and by the exercise of reasonable diligence could have ascertained as well before as after the trial what it is now claimed a member of the firm of subcontractors would testify.

The judgment is affirmed.

HUTCHESON, Circuit Judge (dissenting).

Though the confident opinion of my brothers that the case was correctly decided below shakes, it does not overthrow, the conviction I have that defendant is being sued for a debt he never did contract, held liable upon an express assumpsit which he never undertook.

The case went to trial on two counts; count A, with which we are concerned, was sent to the jury. It declared that on or about October 20, 1929, plaintiff, appellee here, "made a contract with the defendant (appellant here) to manufacture and deliver to it mortar in accordance with specifications; that defendant breached the contract in that it manufactured and delivered to plaintiff mortar not in accordance with the specifications."

I think that the record contains no evidence showing or tending to show that a contract to deliver mortar to plaintiff was ever made, or that any mortar was ever delivered to it. On the contrary, it shows overwhelmingly that while defendant did have negotiations with plaintiff, they were preliminary, and when it made its contract, it was not in parol but in writing, not with the plaintiff, but with Standard Material Company. I think, therefore, that the defendant should have had an instructed verdict. If I am wrong in this, and the question whether plaintiff and defendant did contract presented an issue of fact, the issue was not fairly submitted to the jury for instead of submitting as the court should have done "whether the conversation was with contractual intent or not" (Henderson Bridge Co. v. McGrath, 134 U. S. 260, 10 S. Ct. 730, 33 L. Ed. 934), that is, whether what the parties said was said with the mutual intent of making a contract, the court told the jury that if they believed Allen's testimony to be true, they should find that a contract was made. When it is considered that Allen's testimony consisted of conversations which he had with Brooks, the agent of the defendant, the words of which were not sufficient to make a contract, and of his legal conclusions given on the trial as to the effect of those conversations, it is at once seen that the court in effect advised the jury that Allen's statement of his intent concluded the matter, thus taking from them all consideration of the intent of the other party to the conversation.

In order to present these points which I think the record establishes, I shall set the evidence out, first stating the undisputed facts, and next Allen's testimony, setting out in capitals that part of his testimony which consists of his legal conclusions.

### The Undisputed Facts.

The mortar specifications for the Watts Building, at the request of Brooks, of the Blue Diamond Company, provided: "All mortar shall be of one part Magnolia Cement and 2½ parts clean, sharp sand. To this mixture 10% lime may be added to make it work easier. The mortar as above specified may be made by the Blue Diamond process." Thereafter Brooks and Allen, the contractor for the Watts job, had a conversation regarding the use of Blue Diamond mortar. Though at that time Allen had not done so, he later sublet the masonry work of the building to the Lewis Building Company. That company, in accordance with the custom prevailing in the trade of buying material not direct, but through a materialman, bought the mortar through the Standard Building Material Company, which, in turn, bought it from the Blue Diamond Company, on this written order:

"Order No. 7326

"Standard Building Material Company
    formerly
"Standard Fuel and Material Company,
        Birmingham, Ala.
"To The Blue Diamond Company,
        "February 15, 1928.
"3030 Avenue C
"City.
    "Please ship to
    "Name—Lewis Building Company; Town Birmingham, Alabama
    "Route—Trucks Place—Watts Building, Third Ave. & 20th St. No.
    "When ship—As ordered
"Quantity      Description      Price
"Requirements of No. 4½ Blue Diamond
      Mortar for the Watts Building
      "Standard Building Material Co.
        "F. D. Horton."

This order correctly described the material that Lewis had ordered from Standard, and the material thus ordered was delivered to Lewis by Blue Diamond. For this material Lewis paid Standard; it in turn paid Blue Diamond. At no time after he sublet the work to Lewis did Allen give any order for the delivery of the mortar, nor was any delivered to him; nor after his conversation with Brooks, hereafter referred to, did he have any further dealings with Brooks about the matter until after the building had been completed, and the leaks had developed. Then Allen called Brooks in and complained that the mortar furnished was not in accordance with the specifications.

In proof of the claimed contract plaintiff offered the evidence of Charles T. Allen, on the effect of which this case turns. This witness testified as to the words used between him and Brooks. He also at the trial gave his conclusions as to the legal effect of the words used. It is these conclusions which have caused the confusion in this case. To make the matter clear, I will set the legal conclusions out in capitals.

### Allen's Testimony as to Conversation between him and Brooks.

After testifying to the contract for the construction of the Watts Building, Allen said:

"It was a part of our duty to buy the material for the building. Mr. Brooks is manager of the Blue Diamond Company and he came to see me about furnishing the mortar for the construction of the Watts Building. In our business of construction of buildings on every contract that we were ready to start, Mr. Brooks would come and solicit the business on the mortar. When we were ready to place the material for the Watts job, he followed out that procedure and I explained to him that we were doing this job under an architect. I told him that we would be governed by the decision of Warren, Knight and Davis on the matter, and that he would have to satisfy them on their specifications. He told me that he had already done that and that they had incorporated it in the specifications. On that assurance I told him that we would use the mortar. I told him that the mortar we would use would be the mortar specified by Warren, Knight & Davis. As I recall it, we agreed on the price for the mortar which was either six seventy five or seven twenty five per yard, I do not recall which.

"When I was placing the contract for the material for use in the Watts Building Mr. Brooks spoke to me in regard to having Blue Diamond mortar used. I told him that if he could satisfy the architects' specifications we would use it at the price he quoted. He said he could do that, and I told him we would use it. There were no letters written in confirmation of this conversation."

This is every word of Allen's testimony as to what was said between him and Brooks. It clearly does not make a contract.

### Allen's Further Testimony Including his Legal Conclusions.

"AT THE TIME I MADE THE CONTRACT with Mr. Brooks to use Blue Diamond mortar we had intended to do the masonry work ourselves and with that in view I HAD BOUGHT THE BRICK terra cotta and mortar. The Lewis Building Company made us a proposition that was so advantageous that we decided to let them do it under a sub-contract. So I entered into a contract with them, explaining to them THAT WE HAD OBLIGATED OURSELVES TO USE BLUE DIAMOND MORTAR, and that we would expect them to use the stuff THAT WE HAD BOUGHT. AFTER WE MADE A CONTRACT TO PURCHASE THE MORTAR IT WAS NEVER CHANGED IN ANY WAY TO MY KNOWLEDGE. I NEVER AGREED TO ANY CHANGE. The mortar was furnished to the subcontractor Lewis Building Company, and it paid for the mortar. The price that the sub-contractor bid for the work was based on the price that we had received for the mortar. I afterwards let the contract to the Lewis Building Company and IT IN TURN BOUGHT THE MORTAR FROM THE STANDARD BUILDING MATERIAL COMPANY ON OUR AGREEMENT. MY UNDERSTANDING WAS that the mortar was furnished to the Lewis Building Company UNDER THE CONTRACT we made with Mr. Brooks."

"The Lewis Building Company did not pay the Blue Diamond Company directly for the mortar. The Blue Diamond Company would not sell to any contractor direct; they enter into negotiations with the contractor and then bill it through a material man. The Blue Diamond Company billed the mortar used on the Watts job through the Standard Building Material Company."

### Brooks' Testimony.

Brooks testified that he did speak to Allen about the Blue Diamond mortar. That Allen told him he did not know whether he would do the work himself or would sublet it. "During the conversation I told him that our mortar was approved by the architects. When I discovered that Mr. Allen was not going to do the brick work on the building, I solicited the brick order from the Lewis Building Company, the subcontractor. It is the policy of the Blue Diamond Company to sell material through the building material dealer. We solicited the order from the Lewis Building Company and asked them which dealer they wished to place this business through. They gave me the order through the Standard Building Material Company. This transaction was not connected at all with any talk or dealings that I had had with Mr. Allen."

At the conclusion of the evidence the defendant moved for an instruction on both counts of the complaint. The motion was granted as to count B, refused as to count A. In submitting to the jury the question whether the plaintiff and defendant had made a contract for the mortar, the trial court did not submit to the jury to find whether, upon all of the evidence they believed that the parties intended to make an agreement. Instead he charged them: "If you believe the testimony of Mr. C. T. Allen as to what transpired between him and Mr. Brooks then there was a contract." To this instruction the defendant duly excepted. Not only were Allen's legal conclusions emphasized in this way, but the court affirmatively told the jury Allen said that the CONTRACT OF SALE WAS COMPLETED at that conversation, and that THE MORTAR WAS SUBSEQUENTLY DELIVERED to the building under THE CONTRACT WHICH HE MADE. "If you believe that to be true, that would show a contract between plaintiff and defendant for the sale of the mortar." To this charge, permitting Allen's legal conclusions to settle the matter, defendant excepted.

But this is not all, the court further charging: "Gentlemen, I said to you if Mr. Allen's testimony was believed, there would be a contract. What I meant by that was this: that Mr. Allen testified that he BOUGHT THE MORTAR THROUGH MR. BROOKS * * * AND THEREFORE ACCORDING TO MR. ALLEN'S TESTIMONY THERE WAS A CONTRACT OF PURCHASE AND SALE THEN CONSUMMATED."

It is appellant's primary position that under the undisputed facts which showed that whatever negotiations Allen and Brooks had were all preliminary to and were finally integrated into a written contract, which Blue Diamond made with Standard Building Company, the court erred in submitting to the jury at all whether or not Allen and Blue Diamond had a contract. I think the defendant is right. Outside of Allen's legal conclusions testified to after the controversy arose that he UNDERSTOOD THE MATERIAL WAS BOUGHT UNDER HIS CONTRACT, there was not a single word of a contractual nature in his testimony. The case is one upon the undisputed facts, not of a contract, but of mere negotiations where neither party was bound, and which eventuated in an entirely different written agreement. Jones & Carey v. Risley, 91 Tex. 1, 32 S. W. 1027; Williston on Contracts, Vol. 1, § 27; Cochran Lbr. Co.

v. Paterson & Edey Lumber Co., 202 Ala. 366, 80 So. 448; Utley v. Donaldson, 94 U. S. 29, 24 L. Ed. 54.

His secondary position is that if there was an issue the form of its submission was erroneous. This position I think indubitable. If what was said between Allen and Brooks might in any event be found to constitute a contract, it could only do so if the parties mutually intended what they said to so result. In telling the jury, as the court did, that if Allen's legal conclusion of the effect of what was done was accepted by them as true, there was a contract, the court entirely disregarded the element of mutuality of intent. It permitted the jury to find a contract upon what Allen alone thought was the result of what had been said, no matter what the defendant thought about it. Where there is a dispute upon whether parties have reached an oral agreement at all, as there was in this case, it is not competent for the jury to take the conclusion of one of the parties alone that a contract had been made, and it was error for the court to so instruct them. Under such circumstances, the court should submit to the jury to find not merely what was said and done and what one of the parties intended, but whether what was said and done was said and done with a mutual contractual intent. Scott v. U. S., 12 Wall. 443, 20 L. Ed. 438; Utley v. Donaldson, supra. "It is for the jury to say whether the conversation was with contractual intent or not. The court had no right to assume as a matter of law, that it was not." Henderson Bridge Co. v. McGrath, 134 U. S. 260, 10 S. Ct. 730, 735, 33 L. Ed. 934.

Believing that the judgment should be reversed, I respectfully dissent.

### On Petition for Rehearing.

PER CURIAM.

As neither of the judges who concurred in the judgment of the court in the above numbered and entitled cause is of opinion that the petition for rehearing should be granted, it is ordered that the said petition be and the same hereby is denied.