848 P.2d 870

AROK CONSTRUCTION COMPANY, a California Corporation, Plaintiff–Appellant,

v.

INDIAN CONSTRUCTION SERVICES, a joint venture between Evcor Builders, Inc., Jeremiah La Mesa and Jane Doe La Mesa, Defendants–Appellees.

No. 1 CA–CV 90–231.

Court of Appeals of Arizona, Division 1, Department B.

Feb. 11, 1993.

Cruse, Firetag & Bock by Robert J. Cruse, Keith B. Forsyth, Phoenix, for plaintiff-appellant.

Burch & Cracchiolo, P.A. by Edwin D. Fleming, Michael Salcido, Phoenix, for defendants-appellees.

## OPINION

LANKFORD, Judge.

Plaintiff AROK Construction Company ("AROK") brings this appeal from the en-

try of summary judgment in favor of Defendants–Appellees Indian Construction Services ("ICS"), Evcor Builders, Inc., and Jeremiah La Mesa. AROK's appeal challenges the superior court's holding that, as a matter of law, no contract existed between the parties because essential terms were absent from the parties' agreement.

During our consideration of this matter, we asked the parties to submit supplemental briefs on the impact, if any, of the Arizona Supreme Court's decision in *Schade v. Diethrich*, 158 Ariz. 1, 760 P.2d 1050 (1988), on the application of *Savoca Masonry v. Homes & Son Construction Co.*, 112 Ariz. 392, 542 P.2d 817 (1975) to the instant appeal. The parties filed supplemental briefs, which we have considered together with the parties' initial briefs.

### I.

■ On review of summary judgment, we view the facts and evidence in a light most favorable to the party against whom summary judgment was granted and draw all reasonable inferences in favor of that party. *United Bank of Ariz. v. Allyn*, 167 Ariz. 191, 193, 195, 805 P.2d 1012, 1014, 1016 (App.1990). Summary judgment was granted against AROK, and we must view the record accordingly.[1]

In 1985, Window Rock Unified School District ("Owner") solicited bids for the services of a general contractor. The Owner is not a party to this lawsuit. ICS submitted a bid to act as the general contractor. ICS listed AROK on the bid as the subcontractor to perform drywall and stucco portions of the construction project.

The bid was based in part on a telephonic bid by AROK of $1.549 million based on the plans and specifications.

Prior to bid closing, ICS asked AROK to reduce its bid from $1.549 million to $1.42 million. The president of AROK stated to the ICS project manager that AROK would reduce its bid even further to $1.4 million if, as a result, ICS would agree to contract with AROK if the Owner awarded the bid to ICS. The ICS project manager stated that in exchange for AROK's further reduction to $1.4 million, "If [ICS] get[s] a job, [AROK] get[s] a job." AROK sent a letter to ICS confirming the $1.4 million quote and enclosed a detailed bid confirmation.

In early 1986, the Owner declared ICS to be low bidder and awarded it the contract to act as general contractor. ICS then requested "value" adjustments to AROK's bid; AROK complied and worked approximately eight to ten hours further reducing the subcontract price.

ICS received a "notice to proceed" from the Owner. After receiving the notice to proceed, ICS disputed the subcontract price. ICS contended that AROK had agreed to perform the work for $1.3 million; AROK maintains that its original bid, as reduced to $1.4 million, is the correct price. Shortly thereafter, ICS entered into subcontracts with two other entities to perform the drywall and stucco work.

AROK and the principals of ICS[2] had entered into contracts on three prior occasions. On each occasion, the parties used identical standard form contracts.[3] Added

---

1. In contrast, the dissenting opinion appears to view the record favorably to ICS.

2. ICS' predecessor, Indian National Developers, Inc., was a joint venture between Chris Evans, Inc. and Luke Johnson, an Indian. Chris Evans, Inc. was a union contractor which was allowed to become inactive; Evcor, a non-union entity, was incorporated to take its place. Evcor's chain of command, officers, directors, and shareholders are identical to those of Chris Evans, Inc.

3. The dissent notes that AROK expressed such dissatisfaction with some terms of the standard form agreement that, in hindsight, it doubted

that it would have agreed to those terms. The proper standard of review on this appeal requires us to also consider contrary testimonial evidence that AROK was agreeable to these terms and the course of dealing in which AROK had agreed to these very terms on three prior occasions. Moreover, the evidence is sufficient to support a conclusion that the contract was formed by oral agreement prior to the execution of the written document. Any different or added terms in the written form would be modifications to the existing contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 27, comment d. Disagreement after the bargain has been struck over changes or additions to agreed upon terms does not undo the existing contract.

to these forms were four identical typed provisions. On one contract, a non-material provision was interlineated and initialed by the parties. When ICS contracted with the replacement subcontractors for this project, it again used the form contract it had used with AROK.

AROK filed this action alleging breach of contract, promissory estoppel, and racketeering. *See* Ariz.Rev.Stat.Ann. ("A.R.S.") § 13–2314 (civil remedies for racketeering). AROK appeals from the summary judgment on the breach of contract and promissory estoppel counts only.

## II.

### A.

The overarching question is whether there is a genuine issue requiring a trial that AROK had a contract with ICS. *See* Ariz.R.Civ.P. 56(c). It is settled law that the bidding process alone does not create a contract. ICS did not obligate itself to use AROK as a subcontractor merely by relying on AROK's subcontract bid or by listing AROK as the subcontractor in the bid. *See Universal Const. Co. v. Arizona Consol. Masonry & Plastering Contractors Ass'n*, 93 Ariz. 4, 8, 377 P.2d 1017, 1019 (1963) (a bid "does not ripen into a contract until voluntarily accepted by the offeree"); *Corbin–Dykes Electric Co. v. Burr*, 18 Ariz.App. 101, 103, 500 P.2d 632, 633–34 (1972) (a subcontractor's bid is nothing more than an offer to perform the subcontract under specified terms and does not ripen into a contract until voluntarily accepted by the general contractor). In short, both AROK's bid to ICS and ICS's bid to the Owner were mere offers to contract. These offers had no binding effect unless and until accepted by the offerees to whom the offers were directed.

A bid becomes a contract, however, when it is accepted. In *Savoca Masonry v. Homes & Son Construction Co.*, 112 Ariz. 392, 542 P.2d 817 (1975), the Arizona Supreme Court considered facts very similar to the facts in this case. The general contractor sought bids. A subcontractor submitted a bid. The general contractor listed that subcontractor in the bid for the construction contract. The owner awarded the contract to the general contractor.

In a telephone conversation, the general contractor informed the subcontract bidder that it had the job. Despite this promise, the general contractor ultimately employed someone else to perform the work. The subcontract bidder sued for breach of an oral contract. The general contractor conceded that the subcontract bid was an offer that had been accepted. Similarly, ICS admits for purposes of this appeal that AROK's bid was an offer accepted by ICS.

Despite the presence of the contract elements of offer and acceptance, the supreme court held in *Savoca Masonry* that the parties' agreement was not binding. The court found that the agreement lacked terms essential to a contract. It reasoned that an enforceable contract did not exist because "such essentials, as manner of payment, time for completion ..., penalty provisions, bonding, etc.," were not agreed upon. *Savoca Masonry*, 112 Ariz. at 395, 542 P.2d at 820 (quoting *Plumbing Shop, Inc. v. Pitts*, 67 Wash.2d 514, 518–19, 408 P.2d 382, 384–85 (1965)). The court stated that "only price and work involved were agreed upon.... A sufficient mutual understanding as to *all* the terms of the contract did not exist." 112 Ariz. at 395, 542 P.2d at 820 (emphasis added). The court found that agreement on such terms as manner and time of payments, penalty provisions, time for completion, and bonding was essential to contract formation.

Similarly, some terms are missing from the agreement in this case and, at first blush, *Savoca Masonry* appears to warrant summary judgment against the subcontract bidder, AROK. However, the Arizona Supreme Court later considered the same legal issue—whether missing terms rendered an agreement unenforceable—in the context of an employment case. *Schade v. Diethrich*, 158 Ariz. 1, 760 P.2d 1050 (1988). In contrast to *Savoca Masonry*, the supreme court held in *Schade* that an employment severance agreement was enforceable even though important terms were left unresolved.

In *Schade,* the employer merely promised to enter into a fair and equitable severance agreement, with the specific terms to be resolved later. Our supreme court held that such an agreement was sufficiently definite to be enforceable. The court examined the transaction in terms of whether a bargained-for exchange and consideration existed, finding that the only provisions of a multi-term agreement which were uncertain and left for later resolution were those relating to severance pay and benefits. *Schade,* 158 Ariz. at 8–9, 760 P.2d at 1057–1058. The court stated that certainty of terms relates to the parties' intent to contract: "[T]he requirement of certainty is not so much a contractual validator as a factor relevant to determining the ultimate element of contract formation—the question whether the parties manifested assent or intent to be bound." 158 Ariz. at 9, 760 P.2d at 1058. Thus, the overriding question is whether the parties intended to contract.

Our supreme court found that the *Schade* agreement sufficiently manifested mutual assent to be bound by contract despite the absence of agreement on the most basic terms of the severance package:

> Any requirement of "reasonable certainty" is satisfied if the agreement that was made simply provides "a basis for determining the existence of a breach and for giving an appropriate remedy." RESTATEMENT (SECOND) OF CONTRACTS § 33(2).... [T]he trial court did not need to take upon itself the task of filling the gaps in the parties' agreement and designing an appropriate remedy. It had, instead, the opinion of experts mutually selected by Diethrich and Schade. The Committee to which they turned to recommend a fair and equitable severance agreement was composed of businessmen familiar with personnel practices involving senior executives....

*Schade,* 158 Ariz. at 10–11, 760 P.2d at 1059–60. The court held that the parties had made an enforceable bargain.

*Schade* reflects a clear and overwhelming trend in the law. The old "formalist" view limited the agreement to written

terms and emphasized rules of contract, such as the requirement that the agreement include all material terms. This has long since given way to the "realist" approach, exemplified by the Uniform Commercial Code and the Second Restatement of Contracts. The latter emphasizes standards rather than rules, and assigns to courts the task of upholding the agreements parties intended to make. *See generally* Richard Speidel, *Restatement Second: Omitted Terms and Contract Method,* 67 CORNELL L.REV. 785 (1982).

The courts have employed the modern approach to uphold construction contracts which lack material terms. For example, an informal agreement covering price, nature of the work and schedule of the work but lacking other terms was held enforceable in *Havens Steel Co. v. Randolph Engineering Co.,* 613 F.Supp. 514 (W.D.Mo. 1985), *aff'd,* 813 F.2d 186 (8th Cir.1987). In *Henry C. Beck Co. v. Arcrete, Inc.,* 515 S.W.2d 712 (Tex.Civ.App.1974), *writ dism'd* (1975), the court held that the parties to a subcontract could be bound without agreeing on all terms if they intended to do so.

In light of *Schade,* we believe that our supreme court would decide *Savoca Masonry* differently today. In *Schade,* the court found an enforceable contract when the agreement between the parties was an oral agreement to enter into a contract representing a fair and equitable severance package. In the instant case, the agreed terms were more settled than in *Schade.*

Just as importantly, there is evidence in this case which permits resolution of any indefiniteness in the agreement. Unlike either *Schade* or *Savoca Masonry,* the record here contains evidence of a prior course of dealing in which agreement had been reached in other construction contracts on the very terms which ICS claims are missing from this contract. The availability of this evidence distinguishes *Savoca Masonry.*

### B.

We hold that the evidence is sufficient to raise a triable issue of whether a contract exists. Again viewing the evi-

dence in the light favorable to the party seeking a trial, we learn that AROK's offer—its bid—was accepted by ICS. An agreement was made when ICS requested AROK to reduce its bid from $1.549 million to $1.42 million. AROK's president stated at the time that if ICS would guarantee AROK the contract, AROK would reduce its bid even further to $1.4 million. ICS's project manager responded, "If we get the job, you get the job." AROK later sent a confirming letter and detailed bid confirmation.

ICS concedes for purposes of this appeal that its conditional promise,[4] "If we get the job, you get the job," is an acceptance of AROK's promise to perform the work for a reduced price. ICS bargained for the lower bid price from AROK; AROK bargained for the promise of the contract award. The exchange of these return promises constitutes consideration.[5] ICS further admits that consideration was given.

ICS contends, however, that the parties failed to specify other terms essential to indicate their intent to be bound: the manner and time of payments, penalty provisions, time for completion, and bonding. We note that ICS does *not* contend that a contract was never formed because the parties expressed disagreement about specific terms.[6] Rather, ICS argues that the parties simply never discussed some terms, leaving gaps in the agreement. Relying on *Savoca Masonry*, ICS argues that as a result of the missing terms, no enforceable contract exists as a matter of law.

Is the agreement too uncertain to enforce? In *Schade*, our supreme court relied on the RESTATEMENT (SECOND) OF CONTRACTS § 33 as the expression of "settled principles of law." 158 Ariz. at 9, 760 P.2d at 1058. Section 33 establishes "reasonable certainty" as the standard for enforcement, explaining:

(1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.

(2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

(3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.[7]

The RESTATEMENT rule exemplifies the policy of the law to uphold agreements. Courts are never eager to undo agreements. Only when courts ensure that promises create obligations do promises have real meaning. Only then can those in the marketplace rely on their bargains to allocate their resources and plan for the future. "Commitments to take or refrain from taking certain actions are indispensable elements in most forms of interaction and exchange." Gillian Hadfield, *Problematic Relations: Franchising and the Law of Incomplete Contracts*, 42 STAN. L.REV. 927 (1990). For example, AROK presented evidence that it did not bid for other jobs because it had a contract with ICS. If that contract is not enforced, and AROK's resources were idled as a result of

---

**4.** "A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." RESTATEMENT (SECOND) OF CONTRACTS § 224 (1981). If ICS had not been awarded the contract, it would not have been required to pay for the subcontract work under the oral contract. ICS's promise to award the subcontract to AROK if ICS were awarded the general contract is an enforceable conditional promise supported by consideration. *See Electrical Constr. & Maint. v. Maeda Pacific Corp.*, 764 F.2d 619 (9th Cir.1985).

**5.** *Electrical Constr. Maint. v. Maeda Pacific Corp.*, 764 F.2d at 621. *See Carroll v. Lee*, 148 Ariz. 10, 13, 712 P.2d 923, 926 (1986); RESTATEMENT (SECOND) OF CONTRACTS § 71.

**6.** This was also the expressed basis for the superior court's decision.

**7.** The third factor is not at issue on this appeal because ICS has conceded that, for purposes of the appeal, the offer was accepted.

ICS's promise and breach, then one of the goals of contract law—economic efficiency—would be thwarted.

The enforcement of incomplete agreements is a necessary fact of economic life. Business people are not soothsayers, and can neither provide in advance for every unforseen contingency nor answer every unasked question regarding a commercial agreement. This is especially so with a complex contract for a major construction project. Nor are entrepreneurs perfect at drafting legal documents. Finally, parties may want to bind themselves and at the same time desire to leave some matters open for future resolution in order to maintain flexibility. Thus, courts are often presented with incomplete bargains when the parties intend and desire to be bound. *See* Gillian Hadfield, *Problematic Relations: Franchising and the Law of Incomplete Contracts*, 42 STAN.L.REV. 927 (1990). Refusing the enforcement of obligations the parties intended to create and that marketplace transactions require hardly seems the solution.

■ For these reasons, the policy of the law favors enforcement when it is clear that the parties intended themselves to be bound. "[T]he actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon. In such cases, *courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain.*" RESTATEMENT (SECOND) OF CONTRACTS § 33 comment a (emphasis added).[8] Professor Corbin, whose realist view of contract law has prevailed in Arizona and elsewhere,[9] wrote:

If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left. . . .

The fact that the parties have left some matters to be determined in the future should not prevent enforcement, if some method of determination independent of a party's mere "wish, will, and desire" exists, either by virtue of the agreement itself or by commercial practice or other usage or custom.

ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 95, 400–402 (1963).

As ICS contends, some terms of the contract between ICS and AROK to perform the stucco and drywall work were unresolved. However, as the RESTATEMENT indicates, absent or uncertain terms are not fatal to the enforceability of an otherwise binding contract. *Schade* illustrates the point. In that case, the nature of a "fair and equitable" severance package was unresolved.

■ The standard for contract enforceability is not whether the agreement included a resolution of every matter and anticipated every contingency. "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." RESTATEMENT (SECOND) OF CONTRACTS § 33(2) (1981). If a court can determine the existence of a breach by ICS and fashion an appropriate remedy for AROK, then the terms of their agreement are rea-

---

**8.** The conduct of the parties confirms their intention to be bound. Not only does ICS concede for the purposes of this appeal that the elements of offer, acceptance, and consideration were present, ICS requested that AROK perform "value engineering" services after ICS was awarded the general contract. Value engineering consists of changing the bid structure to lower the overall bid price without changing the profit structure for either the general contractor or the subcontractor. AROK suggested various changes in the methods and design of the work. This work product was provided to and utilized by ICS. Only months later did ICS question the amount of AROK's bid. AROK, relying on ICS's statement that "If we get the job, you get the job," performed services for ICS. The words and actions of the parties create at least a question of fact as to whether they intended to conclude a binding agreement.

**9.** *See Darner Motor Sales v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 393, 682 P.2d 388, 398 (1984); Richard Speidel, *Restatement Second: Omitted Terms and Contract Method,* 67 CORNELL L.REV. 785 (1982).

sonably certain and enforceable. Thus, "gaps" or omitted terms, or vague and indefinite terms, are not invariably fatal to the rights of the parties to obtain enforcement of their bargain.

■ The terms of this contract are sufficiently certain for two independent reasons. First, ICS breached the contract at a point when the only terms necessary to determine the existence of the breach (scope of work) and for giving an appropriate remedy (agreed-upon price) were present. Second, there was evidence of a course of dealing involving a standard form contract which could be used to supply any missing terms.

■ Because the breach by ICS was a total breach of the contract—ICS refused to allow AROK to perform the work—the absence of contract terms such as bonding is not fatal to AROK's claim. Only "[i]f the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken" does a contract not exist. RESTATEMENT (SECOND) OF CONTRACTS § 33 comment a. Otherwise, the courts will supply an omitted term, even one "essential" to the contract. *Id.* at § 204. In this case, the refusal by ICS to honor the agreement is a total breach. If ICS made a binding promise to pay AROK for this work, there is sufficient basis for deciding whether a breach occurred even without "gap-filling" by a court.

Applying the view of contract law embraced by Corbin, the RESTATEMENT, our supreme court and courts elsewhere, we hold that the agreement is sufficiently definite to be enforceable. The terms of the oral contract are sufficient to show a breach and to guide the court in awarding an appropriate remedy. The agreement included the scope of the work and price.[10] ICS was in total breach by refusing to allow AROK to perform the drywall and stucco work. The agreed price, together with other evidence such as the cost to AROK of performing the work, will enable the court to give an appropriate remedy. *See* RESTATEMENT (SECOND) OF CONTRACTS § 347.[11] The superior court erred in entering summary judgment in favor of ICS on the ground that the contract was too indefinite.

■ Even if some terms of the oral contract between AROK and ICS were missing or uncertain, "extrinsic evidence is always admissible to aid in interpretation and to establish the meaning that was intended by the parties." CORBIN, *supra,* at 409. Moreover, omitted terms may be supplied by the court. RESTATEMENT at § 204. This approach is clearly the law in Arizona. In *Triangle Const. v. City of Phoenix,* 149 Ariz. 486, 491, 720 P.2d 87, 92 (App.1985), this court held that the court could supply a "reasonable" price to fill an omitted price term. In *Darner Motor Sales,* our supreme court adopted *Corbin's* view of extrinsic evidence:

> In Arizona, ... the interpretation of a negotiated agreement is not limited to the words set forth in the document. Evidence on surrounding circumstances, including negotiation, prior understanding, subsequent conduct and the like ... may be used to interpret the meaning of the provisions contained in the agreement.

140 Ariz. at 393, 682 P.2d at 398.

■ One form of admissible extrinsic evidence is course of dealing. "[A]n offer which appears to be indefinite may be giv-

---

10. Although ICS and AROK dispute the actual amount of the price, they concur that a price term was agreed upon. Therefore, whether the price was $1.4 million as AROK alleges or $1.3 million as ICS alleges is a question of fact for the jury to determine. Even an omitted price term, however, is not fatal to contract formation: "Where a contract price is left to future agreement by the parties and they fail to agree, the price is a reasonable one." *Triangle Const. v. City of Phoenix,* 149 Ariz. 486, 491, 720 P.2d 87, 92 (App.1985).

11. RESTATEMENT (SECOND) OF CONTRACTS § 347. Measure of Damages in General
Subject to the limitations stated in §§ 350–53, the injured party has a right to damages based on his expectation interest as measured by
(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
(b) any other loss, including incidental or consequential loss, caused by the breach, less
(c) any cost or other loss that he has avoided by not having to perform.

en precision by usage of trade or by course of dealing between the parties." RESTATEMENT (SECOND) OF CONTRACTS § 33, comment a. Course of dealing is defined by RESTATEMENT § 223:

(1) A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement.

RESTATEMENT § 223, comment b explains that course of dealing "may become part of an agreement ... by tacit recognition, or it may guide the court in supplying an omitted term.... [I]t may determine the meaning of language or it may annex an agreed but unstated term."

In this case, ICS used essentially the same standard form contract with the subcontractor it ultimately employed as the form which the principals of ICS had used with AROK in three prior contracts. This raises a question of fact as to whether a course of dealing occurred. If the trier of fact determines that the use of the form contract represents a course of dealing, the form would provide all of the terms which ICS now alleges are essential but lacking. *See, e.g., Hughes v. Jemco, Inc.,* 201 So.2d 565 (Fla.App.1967) (prior lease agreements showed that "lease brief" was a binding contract and allowed the court to fill in missing terms).

The dissent suggests that no enforceable contract could exist because the parties contemplated reducing their oral agreement to writing. 174 Ariz. at 300, 848 P.2d at 879. ICS does not advance this argument on appeal. Nor did the superior court rest its decision on this point. Moreover, the bidding documents constituted a written basis for contract, although not addressing every conceivable term. *See Beck v. Arcrete,* 515 S.W.2d 712. Most importantly, the law is otherwise. RESTATEMENT § 27 provides:

Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.

"Formal execution may be a mere formality and have little to do with the actual existence of the contract." MICHAEL S. SIMON, CONSTRUCTION CLAIMS AND LIABILITY, § 5.6, at 112 (1989). *See, e.g., Beck v. Arcrete,* 515 S.W.2d 712.

█ We therefore conclude that even if the parties anticipated making a written agreement, that fact alone does not preclude as a matter of law a jury finding that an oral contract was made. *See Edward L. Nezelek, Inc. v. Southern Bell Tel. & Tel. Co.,* 383 So.2d 979 (Fla.App.1980) (whether parties intend to be bound prior to a further writing is question for jury).

### III.

█ AROK also claims that it is entitled to relief based upon promissory estoppel. We hold that this is a proper claim for relief as an alternative to the contract claim.

If AROK can show that it acted or detrimentally relied upon ICS's promise to award the contract, then promissory estoppel is available. For example, AROK performed "value engineering" allegedly in reliance upon ICS's promise. AROK may also have foregone other work because it anticipated employing its resources in performing this contract. RESTATEMENT (SECOND) OF CONTRACTS § 90(1) states:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

Promissory estoppel was recognized as a proper alternative remedy in a closely analogous case. *Electrical Constr. Maint. v.*

*Maeda Pacific Corp.*, 764 F.2d 619 (9th Cir.1985).

However, the remedy under this theory may be more limited than damages for breach of contract. "The remedy granted ... may be limited as justice requires." RESTATEMENT § 90(1). "In particular, relief may sometimes be limited to restitution or to damages or specific relief measured by the extent of the promisee's reliance rather than by the terms of the promise." *Id.* at comment d. Thus, AROK may be entitled to recover only the value of its work in "value engineering" unless it can show greater loss due to its reliance.

For the reasons stated above, we reverse the superior court's judgment in favor of ICS and against AROK and remand the case back to the superior court for further proceedings consistent with this opinion. We grant AROK's request for attorneys fees and direct it to file an application pursuant to Ariz.R.Civ.App.P. 21 and in compliance with *Schweiger v. China Doll Restaurant, Inc.*, 138 Ariz. 183, 673 P.2d 927 (App.1983).

CLABORNE, J., concurs.

JACOBSON, Presiding Judge, dissenting.

I find myself in the minority and therefore dissent. The majority seems to find the case of *Schade v. Diethrich*, 158 Ariz. 1, 760 P.2d 1050 (1988), to be of such earthshaking departure from previous contract law as to reverse, *sub silentio*, settled supreme court case law in the area of construction contracts.

Before discussing this "new" revelation, I find it necessary to supply some facts not discussed by the majority. The majority opinion correctly sets forth the chronology of events between ICS and AROK, up to the point that AROK submitted its written bid confirmation. What the majority fails to mention is that this bid confirmation contained terms that were different from those contained in ICS's standard contract. Moreover, although the parties had en-gaged in dealings four years prior to the negotiations involved here, AROK was not aware of what the terms of the ICS sub-contract would be, having not seen the contract ICS ultimately used for the dry-wall subcontractors until after this litigation was commenced.

AROK was also aware that at the time ICS made its alleged promise [12] as to employment, any oral agreements would have to be reduced to writing. Also, ICS's standard contract contained a no-damages-for-delay provision that was not acceptable to AROK; AROK would not have entered into a contract containing such a clause. In addition, AROK's president testified that there would be a "real war" over a "pay-when-paid" clause in ICS's standard contract. In short, AROK's president expected post-bid discussions with ICS concerning the "conflicts" between ICS's standard subcontract and AROK's standard proposal. He testified that "where [ICS's] boiler plate form conflicted with [AROK's] boiler plate form, that would have to be worked out ...," and he expected "discussions over some of those items" and would have "expected possible changes." A written contract embracing these "possible changes" was never entered into between the parties. These additional facts are basically undisputed and are neither favorably or unfavorably presented.

I now turn to what the majority contends are diametrically opposed concepts of contract law embraced by *Savoca Masonry v. Homes & Sons Construction Co.*, 112 Ariz. 392, 542 P.2d 817 (1975) and *Schade v. Diethrich*. I note that the majority agrees that if *Schade* does not "more accurately reflect Arizona's common law of contracts," then *Savoca Masonry* is controlling and this case must be affirmed.

Any analysis as to whether *Schade* has such an effect must begin with a true understanding of both the factual predicate for the *Schade* decision and its legal conclusions, for reversals of prior settled law are not to be lightly implied, particularly where the case allegedly overruled is not

---

**12.** For purposes of summary judgment only, ICS does not dispute AROK's factual assertion that its agent said, "if we get the job, [AROK] gets a job."

even mentioned in the overruling decision. Litigants should be entitled to rely upon previous decisions of the supreme court until they are clearly overruled. *Sligh v. Watson,* 67 Ariz. 95, 191 P.2d 724 (1948).

*Schade* involved the termination of an employment contract with a long time valued employee. The trial court, after a trial, made extensive findings of fact. The facts deemed dispositive by the supreme court in its decision were:

> [T]here were a number of oral conversations among Schade, Diethrich and Diethrich's attorney and agent Paul Meyer culminating in an offer made to Schade by Diethrich that if Schade would resign his employment with both Defendants and the International Heart Foundation effective immediately, Schade would receive fair and equitable severance benefits based on his tireless service of 10½ years and his unique contributions, that an unbiased committee would be appointed to make recommendations as to the amount of fair and equitable severance benefits and Schade would continue to work toward presenting the International Cardiovascular Congress IV.

158 Ariz. at 7–8, 760 P.2d at 1056–57.

Moreover, as noted by the supreme court:

> In this case, both Schade and Diethrich began performing within days of making the contract. Having accepted Diethrich's offer by resigning his former position on November 17, 1982, Schade undertook his newly defined duties for the Congress the next day. According to the terms of his agreement with Diethrich, he continued to perform these duties in support of the Congress through March 6, 1983. Diethrich, for his part, attended the Foundation's board meeting on December 22, 1982 to personally request the appointment of the committee that would formulate Schade's severance package. *By these acts the parties clearly manifested their joint understanding that they were bound by their promises.*

158 Ariz. at 10, 760 P.2d at 1059 (emphasis added).

The only thing missing from the agreement was the "fair and equitable severance agreement" to be decided by an impartial committee. The supreme court noted, "Assuming they [the committee] acted in good faith, Diethrich and Schade impliedly agreed to accept the Committee's recommendation *if* they found it fair and equitable." *Schade,* 158 Ariz. at 11, 760 P.2d at 1060 (emphasis in original).

The supreme court found that the implied agreement to be bound by what was "fair and equitable" did not render the agreement incapable of either being formed or enforced. In doing so, the court relied upon the one hundred year old decision in *Joy v. City of St. Louis,* 138 U.S. 1, 11 S.Ct. 243, 34 L.Ed. 843 (1891).

In *Joy,* the United States Supreme Court held:

> Although the statement is that the compensation is to be such "as may be agreed upon by such companies," yet the statement that it is to be "fair and equitable" plainly brings in the element of its determination by a court of equity.... If the parties agree upon it, very well; but if they do not, still the right was is to be enjoyed upon making compensation, and the only way to ascertain what is "fair and equitable" compensation therefore is to determine it by a court of equity. *In this view, it cannot be said that the court is making an agreement for the parties which they did not make themselves.*

138 U.S. at 43, 11 S.Ct. at 255. In adopting this reasoning, the court in *Schade* held:

> Here, as in *Joy,* if the parties could agree upon what was "fair and equitable," then "very well; but if they [did] not," then the Committee's recommendation might be agreed upon, but if not, what was to be "fair and equitable compensation ... [would be] determine[d] ... by a court of equity." ... The trial court found ... that the recommendation [of the Committee] was "fair and equitable" and adopted it.... The trial court's finding was supported by credible evidence, and we, in turn, are bound by the trial court's finding.

158 Ariz. at 11, 760 P.2d at 1060 (citations omitted).

In essence, what *Schade* holds, completely in keeping with long-established principles of contract law, is that if the parties agree to abide by what is "fair and equitable," assuming contractual intent, the parties impliedly agree that the fact that the future determination of what is "fair and equitable" may be settled by a court does not make the contract indefinite. *See Henderson Bridge Co. v. McGrath,* 134 U.S. 260, 10 S.Ct. 730, 33 L.Ed. 934 (1890) (holding a promise to do "what is right" enforceable so long as it was made with contractual intent); *Brennan v. Employers' Liability Assurance Corp.,* 213 Mass. 365, 100 N.E. 633 (1913) (holding that a promise to "make it right" did not fail for indefiniteness); *Noble v. Joseph Burnett Co.,* 208 Mass. 75, 82, 94 N.E. 289 (1911) (upholding the enforceability of a promise to pay "a fair and equitable share of the net profits" as neither so indefinite nor so impracticable that it cannot be applied with reasonable certainty).

Again, *Schade* relies upon well settled principles of contract law when it quotes from RESTATEMENT (SECOND) OF CONTRACTS § 33(3) and the comment to that section:

The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

. . . . .

But the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon.

158 Ariz. at 9, 760 P.2d at 1058.

In *Schade,* the trial court found that by reason of the parties' action in proceeding to perform the agreement, they manifested an intent to conclude a binding agreement. The supreme court concurred in this conclusion. Thus, *Schade* is not a bump in the universal fabric of contract law; nor does it reflect a "realist approach" to contract law; it merely restates settled principles.

Unlike *Schade,* in this case there were no actions by the parties that would indicate they intended to enter into a binding agreement; everyone agreed that the oral promises needed to be reduced to writing. In this case, the parties did not agree to be bound by what was "fair and equitable." Rather, the entire contract, including disputed provisions dealing with "no-damage-for-delay" and "pay-when-paid," was unresolved. The majority contends that these "missing terms" can be supplied by looking to the custom utilized by the parties in the past. Aside from the fact that certain provisions of this "standard contract" required further negotiations, the law is clear that custom and usage cannot be used to provide missing essential elements of a contract, but only to clarify or explain terms in a contract already formed. *Savoca,* 112 Ariz. at 395, 542 P.2d at 820.

Moreover, what parties may have been willing to agree to years before, does not mean these same terms would be agreeable today. Time and circumstances change the economic feasibility of construction contracts. Business relationships should not be cast forever in the same contractual mold.

Thus, the majority, unlike the court in *Schade,* is not merely supplying "a missing term," it is creating a contract for the parties, which they themselves refused to create.[13] I would affirm on the clear au-

---

**13.** I also believe the majority goes too far in "holding" that "AROK's offer—its bid—was accepted by ICS," at 296, 848 P.2d at 875, when that question was not at issue on appeal "because ICS has conceded that, for purposes of the appeal, the offer was accepted," at 296 n. 4, 848 P.2d at 875 n. 4.

Furthermore, although the majority observes that "[t]he words and actions of the parties create at least a question of fact as to whether they intended to conclude a binding agree-

ment," at 297 n. 9, 848 P.2d at 876 n. 9, it then concludes that ICS's refusal to allow AROK to perform the work "was a total breach of the contract," at 298, 848 P.2d at 877, apparently as a matter of law. Thus, on remand, it appears there is nothing left for the trier of fact to do but to determine damages if it is to act "consistent with this opinion," at 298–99, 848 P.2d at 877–78.

I believe these holdings are beyond the scope of our review on appeal from summary judg-

thority of *Savoca*, not having the omnipotence to forecast that the present supreme court would decide that case differently today.

ment, where the only issue before us is whether the trial court erred in finding no issue of mate-

rial fact regarding the formation of a contract.