SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| RY-TAN CONSTRUCTION, INC., an Arizona corporation, | ) Arizona Supreme Court ) No. CV-04-0300-PR ) |
| Plaintiff-Appellee, | ) Court of Appeals ) Division One |
| v. | ) No. 1 CA-CV 03-0248 ) |
| WASHINGTON ELEMENTARY SCHOOL DISTRICT NO. 6, a political subdivision of the State of Arizona; THE GOVERNING BOARD OF THE WASHINGTON ELEMENTARY SCHOOL DISTRICT, a Legislative Body of Washington Elementary School District No. 6, | ) Maricopa County ) Superior Court ) No. CV99-006812 ) ) ) **O P I N I O N** ) ) |
| Defendants-Appellants. | ) ) ) |

Appeal from the Superior Court of Maricopa County
Honorable Mark R. Santana, Judge
**REVERSED AND REMANDED**

_____

Opinion of the Court of Appeals, Division One
208 Ariz. 379, 93 P.3d 1095 (App. 2005)
**VACATED**

_____

FRANCIS J. SLAVIN, P.C.                                    Phoenix
By   Francis J. Slavin
     Ellen B. Davis
Attorneys for Ry-Tan Construction, Inc.

JENNINGS, STROUSS & SALMON, P.L.C.                         Phoenix
By   David B. Earl
     David J. Cantelme
     Gordon L. Lewis
Attorneys for Washington Elementary

School District No. 6; The Governing
Board of the Washington Elementary School
District No. 6

HOLM, WRIGHT, HYDE & HAYS, P.L.C.                    Phoenix
By  Brad Holm
Attorneys for Amicus Curiae
City of Phoenix and League of
Arizona Cities and Towns

_____

McGREGOR, Vice Chief Justice

¶1        We granted review primarily to consider whether a school district is contractually bound when it has accepted a construction bid but has not yet executed a written contract.[1] We conclude that a school district is not contractually bound prior to the execution of a written contract.  We exercise jurisdiction pursuant to Article 6, Section 5.3 of the Arizona Constitution and Rule 23 of the Arizona Rules of Civil Appellate Procedure.

**I.**

¶2        On January 4, 1999, the Washington Elementary School District (the District) solicited bids for the construction of new classrooms.  Ry-Tan Construction, Inc. was the lowest bidder.  On February 12, 1999, the project architect recommended that the contract be awarded to Ry-Tan.

¶3        Representatives from the District met with Ry-Tan on

_____

[1]   We granted review on other issues but, because our resolution of this question resolves this controversy, we do not reach those issues.

2

March 1, 1999. At that meeting, the parties discussed problems that had arisen during a 1995 construction project that Ry-Tan had completed for the District. During that project, Ry-Tan began construction prematurely, prior to the completion of asbestos removal by an abatement contractor. As a result, the District sustained fines and citations. Ry-Tan signed an acknowledgment that it would "take all steps necessary to ensure that this type of situation does not occur again."

¶4 On March 11, 1999, the School District's governing board (the Board) voted to accept Ry-Tan's bid, and the Board's executive director signed a Notice to Proceed. The Board scheduled a meeting with Ry-Tan for March 12, 1999, at 3:00 p.m. At that meeting, the parties were to formally execute the contract documents and Ry-Tan was to receive the Notice to Proceed and provide required bonds.

¶5 On the evening of March 11, 1999, Ry-Tan took equipment to the construction site and began work prior to execution of the formal contract. Upon learning of Ry-Tan's action, District personnel refused to sign the contract and cancelled Ry-Tan's bid.

¶6 Ry-Tan denied that District personnel had instructed it not to begin work before signing the contract and argued that the District lacked authority to cancel or modify the contract. Nevertheless, the Board voted to re-bid the project.

¶7        Ry-Tan brought this action, contending that the Board's approval of Ry-Tan's bid created a binding contract. It further argued that signing the contract documents and posting the required bonds constituted mere formalities and did not serve as a condition precedent to contract formation. After hearing argument on cross-motions for summary judgment, the trial court held that Ry-Tan could proceed with its action, concluding that "there were only ministerial functions left to accomplish once the school board awarded the contract . . . ."

¶8        The jury returned a verdict in favor of Ry-Tan. The court of appeals affirmed, holding that "a contract was formed between the School District and Ry-Tan as of the date of the Board's vote, when the Board found that Ry-Tan was the lowest responsible bidder and made the award." *Ry-Tan Constr., Inc. v. Wash. Elementary Sch. Dist.*, 208 Ariz. 379, 389 ¶ 32, 93 P.3d 1095, 1105 (App. 2004).

## II.

¶9        More than fifty years ago, this court addressed the issue of contract formation involving public entities in *Covington v. Basich Brothers Construction Company*, 72 Ariz. 280, 233 P.2d 837 (1951). That case arose after Basich Brothers Construction Company (Basich) submitted a bid to the Arizona State Highway Commission (the Commission) to build a road. *Id*. at 282, 233 P.2d at 838. As required by the bid specification,

4

Basich's "proposal guarantee," a certified check for $30,000, accompanied the bid. The Commission accepted Basich's bid and sent a letter awarding it the contract. Under the terms of Basich's proposal, the company had ten days to execute a contract after receiving notice of the award.

¶10     Soon after it sent the letter awarding the contract, the Commission adopted a resolution stating that if Basich did not execute and return the contract within ten days of the date of the award, the award would be revoked and the proposal guarantee forfeited. Ten days after making the award, the Commission notified Basich that its proposal guarantee had been forfeited and the contract had been awarded to the next lowest bidder.

¶11     Basich then brought a mandamus action to recover the proposal guarantee. The trial court held that the notice given by the Commission of its intention to revoke the award was defective and ordered it to return the proposal guarantee. On appeal, we upheld the judgment of the trial court. *Id.* at 288, 233 P.2d at 842.

¶12     We concluded that mandamus was the proper remedy, in part because the "proposal and award were preliminaries looking toward the execution of a formal contract . . . ." *Id*. at 285, 233 P.2d at 840. We held that the Commission could revoke the award because "a contract with a public agency is not binding on

the public agency until a formal contract is executed," *id.,* and that "the commission [had] the right to reject any and all bids at any time before a formal contract [was] entered into." *Id.* at 286, 233 P.2d at 840-41. Because no contract had been formed, the parties should be returned to their pre-award positions and the deposit returned to Basich.

¶13    If we apply *Covington*'s "bright-line" rule to the facts of this case, the District must prevail. *Covington* established that a public agency that accepts a bid on a public contract is not bound until a formal contract exists. Because Ry-Tan and the District never executed a formal contract, Ry-Tan cannot recover from the District if *Covington* controls. Ry-Tan successfully argued to the court of appeals, and argues here, that its situation can be distinguished from that considered in *Covington*. Alternatively, Ry-Tan suggests, we should overrule our decision in *Covington*.

### III.

### A.

¶14    The court of appeals accepted Ry-Tan's approach, concluding first that it could distinguish *Covington* on the basis of its unusual facts. As the court explained, *Covington* was "a mandamus action clearly based in equity." *Ry-Tan Constr.*, 208 Ariz. at 385 ¶ 20, 93 P.3d at 1101. Expounding on that fact, the court held that *Covington*'s "statement regarding

6

contract formation must be interpreted in that context." *Id*. at ¶ 22. The court then held that *Covington* "provides no indication that [the Arizona Supreme Court] was establishing a hard-and-fast rule that would trump different contract terms or different circumstances." *Id*.

¶15 Although *Covington* arose out of a particular set of facts, as is true of every judicial decision, and also involved a request for mandamus relief, that opinion did establish a controlling, bright-line rule that governs contracts entered into by public entities after accepting a bid. The opinion gives no indication that this court intended to limit it to the facts or type of relief involved, and we see no basis for distinguishing it on either basis.

**B.**

¶16 The court of appeals also held that *Covington* does not control this action because "the procedures and formalities surrounding contract formation and the awarding of public contracts in Arizona have changed [since 1951]." *Ry-Tan Constr.*, 208 Ariz. at 387 ¶ 25, 93 P.3d at 1103. The court noted that, since the *Covington* decision, "Arizona has adopted § 27 of the Restatement (Second) of Contracts." *Id*. That statement is accurate but does little to advance our analysis.

¶17 Section 27 of the Restatement (Second) of Contracts provides that:

> Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.

Restatement (Second) of Contracts § 27 (1981). In support of the proposition that Arizona has adopted this section, the court refers to three recent decisions of the court of appeals. *See Tabler v. Indus. Comm'n*, 202 Ariz. 518, 521 ¶ 10, 47 P.3d 1156, 1159 (App. 2002); *Johnson Int'l, Inc. v. City of Phoenix*, 192 Ariz. 466, 470-71 ¶ 26, 967 P.2d 607, 611-12 (App. 1998); *AROK Constr. Co. v. Indian Constr. Servs.*, 174 Ariz. 291, 297, 848 P.2d 870, 876 (App. 1993).

¶18        It is true that, in most contexts, section 27 captures a well-established rule of contract law. This rule, however, was not unknown to Arizona courts at the time we decided *Covington.* By that time, this court had already essentially adopted the Restatement view when it held that if parties expressed an intent to be contractually bound, they would be deemed so bound, even if the requisite formalities of acceptance were not explicitly followed. *See Pratt-Gilbert Co. v. Renaud*, 25 Ariz. 79, 86-87, 213 P. 400, 403 (1923) (holding that even though explicit contractual method of acceptance was not followed, conduct of parties expressed intent to be bound). Moreover, the Restatement (First) of Contracts, in effect when

8

we decided *Covington,* included a provision almost identical to that of section 27 of the Restatement (Second) of Contracts.[2] The principle embraced by section 27 of the Restatement, therefore, was neither new nor unknown when we decided *Covington.*[3]

---

[2]    Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but other facts may show that the manifestations are merely preliminary expressions as stated in § 25.

Restatement (First) of Contracts § 26 (1932).

[3]    The court of appeals also noted that the *Covington* court relied on Williston's treatise on contracts, notably this passage:

> In the formation of public contracts the formalities required by law or by the request for bids, such as a written contract, or the furnishing of a bond, often indicate that even after acceptance of the bid no contract is formed, until the requisite formality has been complied with.

*Ry-Tan Constr.*, 208 Ariz. at 384 ¶ 19, 93 P.3d at 1100 (quoting *Covington*, 72 Ariz. at 285, 233 P.2d at 840 (quoting 1 Samuel Williston, *Williston on Contracts* § 31 (1936)). The court of appeals quotes extensively from the current version of *Williston* and notes that editions "then and now, support[] an approach to contract formation based on the applicable facts and circumstances." *Ry-Tan Constr.*, 208 Ariz. at 388 ¶ 28, 93 P.3d at 1104. This is undoubtedly so. The fact remains, however, that this court adopted our bright-line rule rather than an

9

## C.

¶19    Ry-Tan also argues that the Arizona School District Procurement Code (the Code), Ariz. Admin. Code (A.A.C.) R7-2-1001 to R7-2-1195, dramatically altered the landscape of school procurement contracts and effectively displaced the common law rule of *Covington*.  The state board of education adopted the Code in 1987 pursuant to legislative authority.  A.R.S. § 15-213.J (Supp.  2004).  By its terms, the Code governs the "expenditure  of  public  monies"  for  a  school  district's procurement of "construction, materials and services."  A.A.C. R7-2-1002.A.

¶20    The legislature, of course, can modify or abrogate the common law.  To do so, however, it must express its intent clearly and, "[a]bsent a clear manifestation of legislative intent to abrogate the common law, we interpret statutes with every intendment in favor of consistency with the common law." *Pleak v. Entrada Prop. Owners' Ass'n*, 207 Ariz. 418, 422 ¶ 12, 87 P.3d 831, 835 (2004) (citation omitted).  This general rule carries even greater force when the entity enacting the scheme is an administrative agency acting only within the limited authority granted by the legislature. *See Gunty v. Dep't of Employment Serv.*, 524 A.2d 1192, 1197 (D.C. 1987) (holding that unless  an  administrative  regulation  fairly  expresses  an

_____
indeterminate, flexible approach.

intention to modify the common law, it should not be interpreted to do so).  We conclude that the provisions of the Code do not modify or abrogate the common law bright-line rule adopted in *Covington*.

¶21    We note first that the Code explicitly states that the common law of contracts, the Uniform Commercial Code, and principles of law and equity as they exist in Arizona supplement the terms of the Code.  A.A.C. R7-2-1002.D.  The *Covington* decision*, of course, is part of Arizona's common law of contracts and, as such, operates with other common law sources to supplement the terms of the Code.  Because the Code by its terms incorporates *Covington*, we will, if possible, interpret its holding as being consistent with, rather than abrogating, the *Covington* holding.

¶22    As Ry-Tan argues, some portions of the Code suggest that the District could not cancel an award.  For example, the Code directs that, after receipt and review of proffered bids, a "contract *shall* be awarded to the lowest responsible and responsive bidder whose bid conforms in all material respects to the requirements and evaluation criteria set forth in the invitation for bids."  A.A.C. R7-2-1031.A (emphasis added).  Other sections of the Code authorize a public entity to reject a bid before award, but do not authorize such an action after an award.  *See* A.A.C. R7-2-1074 (providing that after receipt of

11

bids, but before award, the district may cancel a solicitation if advantageous, but only before award); A.A.C. R7-2-1076.A. (providing that a district may reject nonresponsive or nonresponsible bids only before a contract is awarded). Ry-Tan asserts that these provisions support the notion that the District entered into a contract with Ry-Tan at the time it accepted the company's bid and could not thereafter cancel the award. While the Code's language could be interpreted that strictly, nothing in the Code expressly prohibits a public entity from withdrawing a bid after acceptance of the bid but prior to the award of a contract.

¶23    Moreover, in other sections, the Code itself distinguishes between bid awards and the execution of final contracts. For example, A.A.C. R7-2-1111 requires that bid security must accompany certain bids.[4] The purpose of bid security, or a bid bond, is to "compel[] [a] contractor to enter into the contract according to the terms of his bid." *Marshall v. Dietrich*, 30 Ariz. 54, 62, 243 P. 910, 913 (1926).

¶24    A separate Code provision, however, requires a bidder to post a performance bond upon formal execution of the contract. A.A.C. R7-2-1112. "[T]he purpose of a performance

---

[4]    Bid security may come in the form of a bond or a certified or cashier's check, A.A.C. R7-2-1111.C.1 & 2, and must be an amount equal to at least ten percent of the bid. A.A.C. R7-2-1111.B.

12

bond is to insure the proper completion of [a] public works project . . . ." *Hartford Accident & Indem. Co. v. Ariz. Dep't of Transp.*, 172 Ariz. 564, 568, 838 P.2d 1325, 1329 (App. 1992). The second bond requirement is inconsistent with the notion that the bid award results in a final contract. That is, if the award of a bid immediately created a binding contract, no bid security to assure entry into the already-completed contract would be necessary. Instead, the Code presumably would require only a performance bond to ensure completion of the project. Ry-Tan's reading of the Code thus renders the bid security required by A.A.C. R7-2-1111 superfluous.

¶25     Additionally, Ry-Tan's approach creates substantial difficulties for bidding entities attempting to comply with A.A.C. R7-2-1112.B. That provision states that the

> performance bond and the payment bond shall be delivered by the contractor to the school district *at the time the contract is executed*. *If a contractor fails to deliver the required performance bond or payment bond, the contractor's bid shall be rejected,* its bid security shall be enforced, and award of the contract shall be made pursuant to this Title.

*Id.* (emphasis added).

¶26     If we were to accept Ry-Tan's argument that its contract with the District was "executed" at the time the District accepted its bid, then the Code *required* the District to reject Ry-Tan's bid because Ry-Tan did not deliver the requisite bonds at the time of execution. Indeed, were we to

13

interpret the Code as establishing that a contract is executed when a bid is accepted, the Code would necessarily require that all bidders be present at the time the bids are opened, with the requisite bonds in hand.  We do not consider that reading of the Code appropriate or practical.

¶27     On the other hand, the provisions above, when read together, anticipate an interval between a bid's award and execution of the contract, an interval that allows the successful bidder to present the required bonds at execution of the contract.  That interpretation is fully consistent with, and allows us to give full effect to, *Covington*.  Because the Code includes no express statement to the contrary, we hold that the Code did not change or abrogate the *Covington* bright-line rule.

**IV.**

¶28     The final question for us is whether public policy requires that we overrule our decision in *Covington*.  As noted, Arizona's governmental entities and bidding companies have relied on *Covington*'s bright-line rule for half a century. Without compelling reasons, we are reluctant to overturn long-standing precedent.  "[P]eople should know what their rights are as set out by judicial precedent and having relied on such rights in conducting their affairs should not have them done away with by judicial fiat."  *White v. Bateman,* 89 Ariz. 110, 113, 358 P.2d 712, 713-14 (1961).

14

¶29     We detect no change in public policy that would lead us to set aside *Covington*'s bright-line rule.  In situations such as this, public funds are at stake.  It is vitally important that the elected officials responsible for the disbursement of such funds retain the flexibility needed to make decisions in the public's best interest.  Allowing a public entity an opportunity to reject a bid until execution of a formal contract occurs provides additional flexibility to respond to conditions that arise after the bid award and before execution of the contract, as occurred in this case, and further opportunity to consider the public interest.

## V.

¶30     Both parties agree that this matter arises out of contract, and both request attorneys' fees pursuant to A.R.S. § 12-341.01 (2003).  In our discretion we determine that, as the prevailing party, the District shall recover those reasonable fees incurred on appeal.  *Wenk v. Horizon Moving & Storage Co.*, 131 Ariz. 131, 133, 639 P.2d 321, 323 (1982).  We will determine the amount of fees in accord with Rule 21 of the Arizona Rules of Civil Appellate Procedure.

## VI.

¶31     For the foregoing reasons, we vacate the opinion of the court of appeals and reverse the superior court judgment. We remand this matter to the superior court with instructions to

15

enter judgment for the District.


_____
                Ruth V. McGregor
                Vice Chief Justice

CONCURRING:


_____
Charles E. Jones, Chief Justice


_____
Rebecca White Berch, Justice


_____
Michael D. Ryan, Justice


**H U R W I T Z**, Justice, dissenting

¶32      The majority holds that this case is controlled by the "bright-line" rule of *Covington v. Basich Bros. Construction Co.*, 72 Ariz. 280, 285, 233 P.2d 837, 840 (1951), that "a contract with a public agency is not binding on the public agency until a formal contract is executed." *See supra* ¶ 13.  I agree with the majority that this case is not factually distinguishable from *Covington*.  *See supra* ¶¶ 14-15.  I also agree that *Covington* has not been overruled *sub silentio* by our decisions embracing the principles of § 27 of the Restatement (Second) of Contracts.  *See supra* ¶¶ 16-18.

16

¶33     I part company with the majority, however, on whether the Arizona School District Procurement Code ("the Code"), Arizona Administrative Code ("A.A.C.") R7-2-1001 to -1195, displaces the *Covington* common-law rule.  I would hold that under the Code a contract is formed when a school district awards a contract, not at subsequent formal execution of the contract.  I therefore respectfully dissent.

## I.

¶34     Arizona Revised Statutes ("A.R.S.") § 15-213(A)(1) (Supp. 2004) requires the State Board of Education to promulgate procurement rules "consistent with the procurement practices prescribed in" the state procurement code, A.R.S. §§ 41-2501 to -2673.  The State Board adopted the Code pursuant to that statutory directive, and the Code therefore has the force of law.  *See Taylor v. McSwain*, 54 Ariz. 295, 311, 95 P.2d 415, 422 (1939) ("It is the general rule that . . . regulations adopted by any commission, under the authority of a statute, have the same force and effect, so far as their scope is concerned, as law . . . .").  As the majority notes, *see supra* ¶ 21, the Code expressly states that the common law of contracts "supplement[s]" its provisions.  A.A.C. R7-2-1002(D).  But this is only if the common law is not "displaced by the particular provisions" of the Code.  *Id.*  The issue in this case is whether the Code has displaced the *Covington* common-law rule either

17

expressly or by necessary implication.  *See Pleak v. Entrada Prop. Owners' Ass'n*, 207 Ariz. 418, 422 ¶ 12, 87 P.3d 831, 835 (2004) ("[I]f the common law is to be changed or abrogated by statute, the legislature must do so expressly or by necessary implication.").

## II.

¶35    The Code sets forth a detailed procedure for the solicitation and award of construction contracts.  The starting point is an invitation for bids ("IFB").  A.A.C. R7-2-1024.  The IFB must include, among other things, all "contract terms and conditions."  A.A.C. R7-2-1024(B)(1)(g).  Any amendments by a district to the IFB's proposed contractual terms must occur "within a reasonable time before bid opening."  A.A.C. R7-2-1026(C).  Thus, bidders know in advance all terms of the contract other than price; nothing is left to negotiation at the time of award.

¶36    The issuance of an IFB, however, does not automatically compel the district to complete the solicitation and enter into a contract with the low bidder.  Rather, "[e]ach solicitation . . . shall state that the solicitation may be canceled or bids or proposals rejected if it is advantageous to the school district."  A.A.C. R7-2-1072.  The district can cancel the IFB at any time before the receipt of bids if it deems such action "advantageous."  A.A.C. R7-2-1073.  After

18

receipt of bids the district may still cancel the solicitation if "advantageous," but only "before award." A.A.C. R7-2-1074.

¶37    The Code also allows the district to reject specific bids without canceling the solicitation if the bidder is determined to be "nonresponsible" or the bid is "nonresponsive." A.A.C. R7-2-1075(A), (B). But once again, the Code requires that any such action be taken *before* an award is made. *See* A.A.C. R7-2-1076(A) ("The school district shall make a determination that a bidder or offeror is responsible before awarding a contract to that bidder or offeror.").

¶38    The majority recognizes that these Code provisions can be read as limiting a school district's ability to cancel a pending solicitation, but declines to interpret the regulations "strictly" because "nothing in the Code expressly prohibits a public entity from withdrawing a bid after acceptance of the bid but before award of a contract." *See supra* ¶ 22.[5] But this approach fails to address the real question posed by this case – whether a district may unilaterally cancel the solicitation *after* award.[6] There is no dispute in this case that the construction contract was awarded to Ry-Tan. At its March 25,

---

[5]    The majority thus seems to assume that "acceptance" occurs before "award." The former term, however, is not used in the Code, and the majority does not define it.

[6]    It is common ground that the Code expressly allows a district to cancel a solicitation *before* award. *See supra* ¶ 36.

19

1999 meeting, the School District Governing Board voted to "Cancel [the] Award," thus clearly acknowledging that an award was made. A similar acknowledgment appears in the District's supplemental brief, which states that the District "cancel[led] the award to Ry-Tan". The District also conceded at oral argument that an award was cancelled.

¶39 The Code expressly provides that the IFB can only be cancelled for the advantage of the district "*before award*." A.A.C. R7-2-1074 (emphasis added). Today's holding effectively amends this rule to provide the district the right to withdraw the solicitation at any time before "execution" of the contract.[7] Had the framers of the Code desired such a result, they surely could have said so more directly.

¶40 The majority's ultimate holding — that a district is free until the execution of a formal contract document unilaterally to decide, for any reason or for no reason at all, that it will not go forward with the contract — also cannot be squared with several other "particular provisions" of the Code. For example, the *Covington* rule is inconsistent with A.A.C. R7-2-1131(A), which provides that "*the contract shall be awarded* to

_____

[7] The majority also incorrectly suggests that Ry-Tan has argued that a contract was "executed" at the time of award. *See supra* ¶ 26. But Ry-Tan's argument is not that the contract was executed. Rather, Ry-Tan argues that there was an "award," that

20

the lowest responsible and responsive bidder." (Emphasis added.) Under the majority's view, the low bidder is not awarded a "contract," but merely a possible opportunity to enter into a contract, an opportunity revocable at the whim of the district.

¶41    The *Covington* rule is also inconsistent with A.A.C. R7-2-1112(B). That regulation provides that a district may refuse to go forward after award if a "contractor" fails to deliver the required performance bond or payment bond. The Code provides no other scenario under which a district can revoke an award. The natural implication is that no other permissible reason exists. More significantly, because the Code defines a "contractor" as "any person who has a contract with a school district," A.A.C. R7-2-1001(16), the reference in R7-2-1112(B) to a "contractor" necessarily assumes that the successful bidder has a contractual relationship with the school district before delivering the performance and payment bonds. Because this delivery is to occur "at the time the contract is executed," A.A.C. R7-2-1112(B), the rule thus plainly contemplates that the contract is formed before formal contract execution.

¶42    Ironically, the majority relies on A.A.C. R7-2-1112(B) in support of its conclusion that the Code leaves the *Covington*

the "award" formed the contract, and that formal "execution" was not necessary for contract formation.

21

rule undisturbed. *See supra* ¶¶ 24-26. But the majority fails to address the significance of the word "contractor" in that Code provision. The majority's reading of R7-2-1112(B) is flawed in another respect. The majority reads the language in subsection B, referring to rejection of a "bid" for failure to deliver performance and payment bonds, as suggesting that no contract is formed until execution.[8] But such a reading leads to an anomalous result. Under this interpretation of the Code, even if the contractor delivers the required bonds, the district is nonetheless free to decide, for whatever reason, not to execute the contract. The award thus would create only unilateral obligations: under R7-2-1112(B), the contractor would be required to deliver the bonds and thereafter to sign the formal contract at the risk of losing its bid security, but the district would have no obligation to accept the tendered bonds or enter the contract.

¶43 A more sensible reading of R7-2-1112(B) is that delivery of the performance and payment bonds and execution of the contract are not prerequisites to contract formation, but rather are conditions precedent to the district's duty to

---

[8] The reference in R7-2-1112(A) to "execution of the contract" provides no support to the notion that a contract is not formed at award. As the majority notes in discussing § 27 of the Restatement (Second) of Contracts, our decisions have long recognized that contract formation can occur before formal execution. *See supra* ¶¶ 17-18.

perform its obligations under the contract that was formed at award. *See* Restatement (Second) of Contracts § 224 (1981) ("A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."); *id.*, introductory note to ch. 9, topic 5 ("Conditions and Similar Events" (§§ 224-30)) ("An obligor may . . . make an event a condition of his duty in order to induce the obligee to cause the event to occur.").

¶44     This interpretation of the Code does not, as the majority suggests, render the requirement of bid security superfluous. *See supra* ¶ 24. The performance and payment bonds are security for the contractor's eventual performance of the contract and payment of subcontractors. The bid security has a different purpose: it serves as a liquidated penalty for any failure on the part of the successful bidder to deliver the performance and payment bonds, and may be forfeited if the contractor fails to do so.

¶45     In short, in my view, the proper reading of the Code is that the district requests offers to enter into a contract by issuance of the IFB. At the time of award, the district accepts the offer of the bidder to enter into the advertised contract at the price specified in the bid. The award is thus the point at which both sides – the bidder and the district — have a meeting of the minds. The district has at that point made the

23

determination that it was not in its best interests to cancel the solicitation and that the bidder is a responsible entity which is willing to enter the contract at the lowest price. The district may take its time before award to carefully consider whether it is in its best interests to cancel the solicitation and may carefully review the qualifications of the low bidder, but once an award is made a contract is formed.

## III.

¶46    The District cancelled the solicitation here because Ry-Tan, after the award but before formal execution of the contract, prematurely delivered equipment to the site and began work. But, as I have noted above, the District's unilateral ability to cancel the solicitation ended at the time of the award. A.A.C. R7-2-1074. Nor could the district have found Ry-Tan a "nonresponsible" bidder at that point, because the Code expressly requires a determination of responsibility before award. A.A.C. R7-2-1076(A).

¶47    What the District is really claiming in this case is that Ry-Tan, having been awarded a contract, breached that contract by commencing work prematurely. However, that argument has already been rejected by the jury, which concluded that Ry-Tan did not commit a material breach of the contract. This finding was upheld on appeal. *Ry-Tan Constr., Inc. v. Washington Elementary Sch. Dist.*, 208 Ariz. 379, 396-401 ¶¶ 65-

24

72, 93 P.3d 1095, 1112-17 (App. 2004).  The District did not seek our review of that issue and thus cannot now claim that Ry-Tan breached the contract.

## IV.

¶**48**    For the reasons above, I would hold that a contract was formed when the District awarded the contract to Ry-Tan and that the District breached that contract when it refused to accept the performance and payment bonds, execute the formal contract document, and accept Ry-Tan's contractual performance. Because the majority concludes otherwise, I respectfully dissent.

_____
Andrew D. Hurwitz, Justice

25